UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ALLSTATE INSURANCE COMPANY;
ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY; and ALLSTATE
PROPERTY AND CASUALTY
INSURANCE COMPANY,

               Plaintiffs,

v.

INTEGRATED MRI CENTER, LLC
d/b/a COMPLETE IMAGING;
ORCHARD LABORATORIES CORP.
d/b/a ORCHARD TOXICOLOGY;
NORTH WEST LABS, INC.; TOTAL
HEALTH REHAB, LLC; SAMI
AHMAD; and OMAR ELIAS a/k/a
OMAR ASKER,

               Defendants.

C.A. No. _____

**Demand for Jury Trial**

## **COMPLAINT**

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter, "Allstate" and/or "plaintiffs"), by their attorneys, SMITH & BRINK, hereby allege as follows.

## I.    <u>INTRODUCTION</u>

1.    This is a case about a magnetic resonance imaging ("MRI") facility, urine drug testing laboratories, a physical therapy clinic, and their owners/managers who engaged in a scheme to defraud Allstate by submitting false and fraudulent insurance claims through the U.S. Mail seeking reimbursement under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, for purported diagnostic testing and physical therapy treatments that were not actually rendered, were improperly referred, were unlawful, were medically unnecessary, and were billed at unreasonable rates.

2.    Defendants Integrated MRI Center, LLC d/b/a Complete Imaging ("Complete Imaging"), Orchard Laboratories Corp. d/b/a Orchard Toxicology ("Orchard Toxicology"), North West Labs, Inc. ("North West Labs"), and Total Health Rehab, LLC ("Total Health") (collectively, the "Defendant Facilities"); Sami Ahmad ("Ahmad"); and Omar Elias a/k/a Omar Asker ("Elias") (collectively with the Defendant Facilities, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetrating a healthcare billing fraud scheme in violation of state and federal law.

3.    The purpose of the fraudulent scheme perpetrated by the defendants was to generate claims for submission to, and collect payment from, Allstate pursuant to Michigan's No-Fault Act for purported MRI testing, urine drug testing,

and physical therapy treatment of patients who were allegedly involved in motor vehicle accidents.

4.      The defendants engaged in a fraudulent scheme to consistently bill Allstate for treatment or services that were not actually provided to patients, including manufacturing documents to make it appear as though patients received services when, in fact, no such services were rendered.

5.      Each of the Defendant Facilities is owned and controlled by laypersons Ahmad and Elias.

6.      To achieve their fraudulent objective, the defendants unlawfully and improperly solicited patients to undergo unnecessary treatment and services, including through the payment of kickbacks to referring providers.

7.      The defendants allowed laypersons, including Ahmad and Elias, to direct medical treatment.

8.      The treatment, when provided, was done as part of a predetermined protocol designed to amass charges as quickly as possible.

9.      The defendants performed hundreds of MRIs and urine drug tests that were unlawful, medically unnecessary, and in violation of applicable standards of care, if such tests were performed at all.

10.      The defendants engaged in several fraudulent billing practices, including unbundling services, to inflate the amount charged to Allstate.

11.    The defendants also charged excessive amounts that far exceeded reasonable and customary billing for services, including urine drug testing and MRI imaging.

12.     Allstate's investigation of claims submitted to it by and on behalf of the defendants revealed treatment that was not tailored to the clinical needs of each patient, but rather was performed solely to generate profit for the defendants.

13.    Allstate reasonably relied to its detriment on the bills and medical documentation submitted to it by and on behalf of the defendants.

14.    Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

15.    All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

16.    The insurance fraud scheme perpetrated by the defendants was designed to and did in fact result in the payment of No-Fault benefits from Allstate to and on behalf of the defendants.

17.    By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

18.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to Complete Imaging, Orchard Toxicology, and Total Health in reliance upon the false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act, (2) treble damages, (3) statutory interest, (4) costs, including but not limited to, the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (5) attorney's fees.

19.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and pending bills submitted to Allstate whereas (1) the defendants billed Allstate for services that were not rendered; (2) the defendants billed Allstate for services and treatment that were not reasonably necessary; (3) the defendants billed Allstate for unlawful treatment; (4) the defendants engaged in fraudulent billing practices; (5) the defendants billed Allstate for medical treatment and testing at amounts that were not reasonable or customary under Michigan's No-Fault Act; and (6) the defendants engaged in a pervasive pattern and practice of submitting false medical documentation through the U.S. Mail demanding payment from Allstate.

20.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $656,705 to them related to the patients at issue in this Complaint.

## II.    PARTIES

### A.    PLAINTIFFS

21.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each corporations duly organized and existing under the laws of the State of Illinois.

22.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

23.    At all times relevant to this Complaint, each of the plaintiffs was authorized to conduct business in the State of Michigan.

### B.    DEFENDANTS

#### 1.    Integrated MRI Center, LLC d/b/a Complete Imaging

24.    Integrated MRI Center, LLC d/b/a Complete Imaging is a Michigan limited liability company organized under the laws of the State of Michigan.

25.    Complete Imaging is owned and controlled by Ahmad and Elias.

26.    Complete Imaging's principal place of business is located in Royal Oak, Michigan.

27.    Complete Imaging billed Allstate at excessive rates for unlawful and unnecessary diagnostic services in relation to several patients at issue herein, including the patients set out in Exhibit 1.

### 2. **Orchard Laboratories Corp. d/b/a Orchard Toxicology**

28.     Orchard Laboratories Corp. d/b/a Orchard Toxicology is a Michigan corporation organized under the laws of the State of Michigan.

29.     Orchard Toxicology is owned and controlled by Ahmad and Elias.

30.     Orchard Toxicology's principal place of business is located in West Bloomfield, Michigan.

31.     Orchard Toxicology billed Allstate for treatment that was not rendered and treatment that was medically unnecessary (to the extent treatment was rendered at all) and unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 2.

### 3. **North West Labs, Inc.**

32.      North West Labs, Inc. is a Michigan corporation organized under the laws of the State of Michigan.

33.     North West Labs is owned and controlled by Ahmad and Elias.

34.     North West Labs's principal place of business is located in Southfield, Michigan.

35.     North West Labs Health billed Allstate for treatment that was not rendered and treatment that was medically unnecessary (to the extent treatment was rendered at all) and unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4. **Total Health Rehab, LLC**

36.     Total Health Rehab, LLC is a Michigan limited liability company organized under the laws of the State of Michigan.

37.     Total Health is owned and controlled by Ahmad and Elias.

38.     Total Health's principal place of business is located in Sterling Heights, Michigan.

39.     Total Health billed Allstate for treatment that was not rendered and treatment that was medically unnecessary (to the extent treatment was rendered at all) and unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 4.

### 5. **Sami Ahmad**

40.     Sami Ahmad is a resident and citizen of the State of Michigan.

41.     At all times relevant to this Complaint, Ahmad owned and controlled Complete Imaging, Orchard Toxicology, North West Labs, and Total Health.

42.     At all times relevant to this Complaint, Ahmad managed the operations of Complete Imaging, Orchard Toxicology, North West Labs, and Total Health.

43.     As owner and manager of Complete Imaging, Orchard Toxicology, North West Labs, and Total Health, Ahmad was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint, including the patients listed in Exhibits 1, 2, 3, and 4.

### 6.    Omar Elias a/k/a Omar Asker

44.    Omar Elias a/k/a Omar Asker is a resident and citizen of the State of Michigan.

45.    At all times relevant to this Complaint, Elias owned and controlled Complete Imaging, Orchard Toxicology, North West Labs, and Total Health.

46.    At all times relevant to this Complaint, Elias managed the operations of Complete Imaging, Orchard Toxicology, North West Labs, and Total Health.

47.    As owner and manager of Complete Imaging, Orchard Toxicology, North West Labs, and Total Health, Elias was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint, including the patients listed in Exhibits 1, 2, 3, and 4.

## III.    JURISDICTION AND VENUE

48.    Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.

49.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

50.    Allstate is a citizen of the State of Illinois for purposes of 28 U.S.C. § 1332.

51.    Ahmad is a resident and citizen of the State of Michigan.

52.    Elias is a resident and citizen of the State of Michigan.

53.     Complete Imaging is a limited liability company organized under the laws of the State of Michigan.

54.     Complete Imaging's principal place of business is in Royal Oak, Michigan.

55.     Ahmad and Elias, the members of Complete Imaging, are citizens of Michigan.

56.     Thus, Complete Imaging is a citizen of the state of Michigan for the purposes of 28 U.S.C. § 1332.

57.     Orchard Toxicology is a corporation organized under the laws of the State of Michigan.

58.     Orchard Toxicology's principal place of business is in West Bloomfield, Michigan.

59.     Thus, Orchard Toxicology is a citizen of the state of Michigan for the purposes of 28 U.S.C. § 1332.

60.     North West Labs is a corporation organized under the laws of the State of Michigan.

61.     North West Labs's principal place of business is in Southfield, Michigan.

62.     Thus, North West Labs is a citizen of the state of Michigan for the purposes of 28 U.S.C. § 1332.

63.     Total Health is a limited liability company organized under the laws of the State of Michigan.

64.     Total Health's principal place of business is in Sterling Heights, Michigan.

65.     Ahmad and Elias, the members of Total Health, are citizens of Michigan.

66.     Thus, Total Health is a citizen of the state of Michigan for the purposes of 28 U.S.C. § 1332.

67.     Each defendant is completely diverse from Allstate for purposes of 28 U.S.C. § 1332.

68.     Further, the amount in controversy, exclusive of interest and costs, against each defendant exceeds $75,000, the sum set forth in 28 U.S.C. § 1332.

69.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    MICHIGAN'S NO-FAULT ACT

70.     Allstate underwrites automobile insurance policies in Michigan.

71.     The defendants submit claims for personal protection insurance benefits under the Michigan No-Fault Act.

72.     Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.  Mich. Comp. Laws § 500.3107(1)(a).

73.     Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation," arising out of a motor vehicle accident provided that all other requirements of the Michigan No-Fault Act are satisfied.  Mich. Comp. Laws § 500.3107(1)(a).

74.      "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the product or service itself is not reasonably necessary."  Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

75.     A provider who seeks to hold an insurer liable for personal protection insurance benefits under the Michigan No-Fault Act has the burden of proving that the service claimed is reasonably necessary, the charge for the service is reasonable, and the expense is incurred.  Id.

76.     A provider "bears the burden of proving both the reasonableness and the customariness of its charges . . . ."  Munson Medical Ctr. v. Auto Club Ins. Ass'n, 218 Mich. App. 375, 385 (1996) (emphasis added).

77.    The Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses thereunder.  Mich. Comp. Laws § 500.3107(1)(a).

78.    The Michigan No-Fault Act is also clear that a medical provider "lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance . . . may charge a reasonable amount for the products, services and accommodations rendered."  Mich. Comp. Laws § 500.3157 (emphasis added).

79.    "If the treatment was not lawfully rendered, it is not a no-fault benefit and payment for it is not reimbursable."  Cherry v. State Farm Mut. Auto. Ins. Co., 195 Mich. App. 316, 310 (1992).

80.    Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of a motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of the loss sustained."  Mich. Comp. Laws § 500.3142(2).

81.    As alleged in this Complaint, the defendants violated Michigan's No-Fault Act by submitting and causing to be submitted bills to Allstate seeking reimbursement for services, treatment, and testing that were not actually provided, were not lawfully rendered, were billed at unreasonable and uncustomary amounts, and were not reasonably necessary for the care, recovery, or rehabilitation of patients.

13

## V.    BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME TO DEFRAUD

82.    The defendants engaged in various forms of illegal and improper conduct to ensure that patients were referred to the Defendant Facilities for as many MRI scans, urine drug tests, and physical therapy treatments as possible, without any regard for the lawfulness or medical necessity of such treatment.

83.    Ahmad and Elias have collectively incorporated and organized dozens of corporations and limited liability companies in the State of Michigan that purport to be related to the provision of healthcare services.

84.    The numerous separate businesses through which Ahmad and Elias conduct business are designed to conceal the extent of their operations and the interrelationships between entities.

85.    Entities incorporated and organized by Ahmad and Elias include marketing companies, management companies, consulting companies, and various companies ostensibly providing medical services, in addition to the Defendant Facilities at issue herein.

86.    One entity owned and controlled by Ahmad was Xperienced Management, LLC.

87.    Xperienced Management, LLC was created by Ahmad to conceal his receipt of kickbacks from medical and chiropractic clinics.

88.     An invoice submitted by Xperienced Management, LLC to Medical Management Partners, LLC, a company that managed several different medical and chiropractic clinics, documents that Ahmad was paid $15.00 every time a patient he referred presented for treatment. *See* Exhibit 5.

89.     Ahmad referred so many patients to these clinics that in a single month there were 1,715 patient visits recorded, for which he was paid $25,725. Id.

90.     Bank records from the clinics to which Ahmad directed patients document that Xperienced Management, LLC received at least $463,058 in payments in a period of time encompassing approximately two (2) years.

91.     Ahmad and Elias were also paid a flat rate of $1,000 per patient for the initial referral of patients to medical and chiropractic clinics.

92.     Neither Ahmad nor Elias have any medical training in the evaluation and diagnosis of injuries sustained in motor vehicle accidents, but they nevertheless routinely made patient referrals.

93.     For example, on April 21, 2012, Elias (using his "Omar Asker" alias) sent an email to Ahmad informing that he had referred five (5) patients "that are due for next Friday's pay." *See* Exhibit 6.

94.     Within one (1) minute, Ahmad forwarded the email to Joseph DeSanto ("DeSanto"), an individual who was involved in the management of the medical and

chiropractic clinics to which Ahmad and Elias referred patients and from whom they received kickback payments.

95.    DeSanto responded from an email address with an @healthsystems.org domain that payment to Elias was approved in the amount of $5,000.  Id.

96.    Other emails and financial records confirm that similar payments were made to Ahmad and Elias over a long period of time, including an email sent by an individual named Gerri Avery from an @healthsystems.org email address approving a $6,000 payment to Elias.  *See* Exhibit 7.

97.    Ahmad and Elias had access to individuals who claimed to be involved in motor vehicle accidents through their relationship with personal injury law firm Elia & Ponto, PLLC ("Elia & Ponto").

98.    Upon information and belief, Sam Elia, an owner of Elia & Ponto, is a relative of Ahmad and Elias.

99.    Since 2012, Sam Elia has shared at least one (1) residential address with Ahmad and at least two (2) residential addresses with Elias.

100.   The residence that Sam Elia shared with Ahmad was owned by a relative of Elia, named Sam Emanuel Elia.

101.   In 2010 and 2012, defendant Elias purchased residences from Sam Emanuel Elia.

102.   Social media accounts of Ahmad and Sam Elia document an extensive history together, including mutual associations with known runners and healthcare providers in Michigan.

103.   Emails sent by Elias confirm his working relationship with a law firm is the source of patient referrals.

104.   For example, one email from Elias to the manager of a clinic to which he sent patients states "I have very limited information on this case cuz its been transferred over from another attorney office."

105.   Other emails concerning patient referrals to the same clinic were sent directly by Sam Elia.

106.   Many of the patients at issue in this Complaint were represented by Elia & Ponto, including at least half of the patients who allegedly underwent treatment at defendant Total Health.

107.   Emails also reveal that Elias identified potential targets for solicitation through Nakhisha Holloway, who operated a company called At-Your Service Professional Group, Inc. with Murtaza Hussain, M.D. ("Hussain").

108.   In March 2015, Hussain was charged with multiple felonies in relation to what was described as an "elaborate" Medicaid fraud scheme involving unlicensed individuals providing medical treatment.

17

109.    Ahmad and Elias utilized a medical transportation company called Bluebird Transportation, Inc. ("Bluebird") to make sure patients they solicited and referred actually presented for evaluation and treatment.

110.    Bluebird routinely submitted bills to Allstate for transportation services that were not actually provided, including through the submission of falsified transportation logs.

111.    Moreover, bills for medical transportation are only compensable if the service is reasonable and medically necessary in light of a patient's injuries.

112.    Ahmad and Elias, both of whom are laypersons, are not qualified to determine whether patients required medical transportation.

113.    Ahmad and Elias's patient solicitation scheme was only designed to benefit themselves financially, and not to provide a benefit to patients.

114.    As explained in one email from Elias to a manager of a clinic to which a patient was referred:  "its [sic] not an auto its [sic] a slip and fall . . . i told sami about it already so set her up and everything and lets [sic] see if there is any money to be made lol."

115.    In another email Elias refers to a solicited patient as a type of currency, stating "[she] will be going to another clinic for pt but we will use her for everything else."

18

116.    Another entity that was owned and controlled by Ahmad was Professional Health Group, Inc. ("Professional Health Group").

117.    Professional Health Group operated a clinic that allegedly provided physical therapy services.

118.    Professional Health Group was the clinic to which Elias referred many of the patients he solicited before the formation of defendant Total Health.

119.    Sam Elia also directly referred patients to Professional Health Group.

120.    Elias's emails also reveal that he improperly directed patient treatment at Professional Health Group.

121.    In one email from Elias to the manager of Professional Health Group, Elias states:

> the following people all need disability slips.  1 [patient #1] need a disabilitty slop for wages loos and house hold services . . . . 2 [patient #2] needs wage loss and house hold . . . . 3 [patient #3] needs house hold service and attending care . . . . 4 [patient #4] need wage loss . . . and we also need all of his medical records.  5 [patient #5] household services . . . . 6 [patient #6] needs attending care and household services from the start of treatment . . . . 7 [patient #7] nurse attending care and house hold services . . . . 8 [patient #8] household servies . . . .  those are all the ones I need hunny if you can have those for me tomorrow I would really appreciate it I should be in by 4pm tomorrow to go over everyone with you.

(all typographical and grammatical errors original).

122.    In another email, Elias listed eight (8) patients who "all need disability slips . . . for house hold services and nurse attending and medical transportation."

19

2:18-cv-10434-GCS-APP   Doc # 1   Filed 02/06/18   Pg 20 of 169   Pg ID 20

123.   The owner of several medical and chiropractic facilities that paid kickbacks to Ahmad and Elias for patient referrals testified about Ahmad's ventures and ambition:

> [Ahmad] was trying to – he wanted to build bigger and do bigger things. He always wanted to, you know, own different things, and he was concentrating on different stuff, so he wanted help managing, and we helped manage for a little bit . . . .

124.   The "bigger things" Ahmad aspired to included the creation of the Defendant Facilities.

125.   Ahmad and Elias used the connections they developed while conducting their illegal patient referral kickback scheme to establish the fraudulent medical treatment scheme described herein.

126.   For example, on July 18, 2013, Gerri Avery, who had previously issued kickback checks to Ahmad and Elias, signed the $4,000 check submitted to the Michigan Department of Community Health to pay the fee associated with Complete Imaging's application for a Certificate of Need ("CON") to operate an MRI facility. *See* Exhibit 8.

127.   Gerri Avery was also identified as the contact person for Total Health's New Practitioner Enrollment application to Blue Cross and Blue Shield.

128.   Thus, there is a direct connection between Ahmad and Elias's patient referral kickback scheme and the establishment of Complete Imaging and Total Health.

129.   Moreover, when Ahmad and Elias formed Total Health, they hired a physical therapist who had been employed by a clinic that paid them kickbacks for patient referrals.

130.   Ahmad and Elias created Complete Imaging, Orchard Toxicology, North West Labs, and Total Health to further exploit the benefits available under the Michigan No Fault.  To maximize the amount charged to the automobile insurers they targeted, the defendants used the illegal, improper, and fraudulent practices detailed below.

## VI.   BILLING FOR SERVICES NOT RENDERED

131.   The defendants frequently billed Allstate for services that were not actually rendered.

132.   Total Health generated three (3) different documents for each alleged date of treatment: (1) a daily visit note; (2) a patient certification; and (3) a bill for services allegedly rendered.

133.   The daily visit notes created by Total Health include certain information about each appointment, including the date and the "session number," which is the cumulative total of patient visits since the course of treatment was initiated, as illustrated below:

| Session No: | 4 | 5 | 6 |
|---|---|---|---|
| Date: | 8/07/14 | 8/13/14 | 8/20/14 |
| Start Time: | 8:45 | | 8:40 |

134.    The patient certifications created by Total Health include a list of physical therapy modalities with the number of units billed for each.

135.    Allstate has discovered multiple instances of bills submitted by Total Health for dates of service that do not appear on the daily visit notes and do not have complete patient certifications, confirming that Total Health billed for services not rendered, as exemplified by the following patients:

- Patient M.S. (Claim No. 0314555897)[1] allegedly began a course of physical therapy at Total Health on July 21, 2014. The daily visit notes created by Total Health indicate that M.S. underwent treatment on seven (7) dates of service, through August 28, 2014. However, Total Health submitted bills to Allstate for eight (8) alleged dates of service for M.S. The alleged date of service not listed on the daily visit notes was August 27, 2014, on which Total Health billed Allstate for application of a hot pack, electrical stimulation, and two (2) units of therapeutic exercise. The record for August 27, 2014 was not inadvertently omitted in Total Health's submission to Allstate, as the daily visit notes record that M.S.'s sixth session was on August 20, 2014 and her seventh and final session was on August 28, 2014.

- Patient B.G. (Claim No. 0324561794) allegedly underwent a lengthy course of treatment at Total Health wherein the daily visit notes record that he underwent his thirty-first (31st) session on October 29, 2014 and his thirty-second (32nd) session on November 3, 2014. However, Total Health submitted a bill to Allstate seeking reimbursement for an alleged date of service on October 30, 2014, representing that it applied a hot pack, electric stimulation, and performed two (2) units of therapeutic exercise.

- Patient T.M. (Claim No. 0187995096) allegedly began a course of physical therapy at Total Health on September 8, 2014, returned for a second session on September 10, 2014, and a third session on September 15, 2014. However, in addition to these three (3) dates,

---

[1] To protect the privacy of its insureds, Allstate refers to each by his or her initials and Allstate claim number.

Total Health also submitted a bill to Allstate seeking reimbursement for an alleged date of service on September 11, 2014, representing that it applied a hot pack, electric stimulation, ultrasound, and performed two (2) units of therapeutic exercise.

136.    Total Health also frequently submitted bills for more alleged services than are documented on its daily visit notes.

137.    The following bills submitted by Total Health are representative examples of bills for physical therapy modalities that are not reflected in patients' treatment records and constitute billing for services not rendered:

- On July 23, 2014, August 6, 2014, and August 7, 2014, Total Health submitted bills for electrical stimulation that was not documented in treatment records relative to patient M.S. (Claim No. 0314555897).

- On May 12, 2014, Total Health submitted a bill for manual traction; and on July 30, 2014, Total Health submitted a bill for massage, none of which were documented in treatment records relative to patient R.L. (Claim No. 0322622945).

- On October 13, 2014, Total Health submitted a bill for electrical stimulation; on October 29, 2014, Total Health submitted a bill for manual traction; and on January 5, 2015, Total Health submitted a bill for a re-evaluation, none of which were documented in treatment records relative to patient B.G. (Claim No. 0324561794).

138.    Many of the treatments allegedly rendered by Total Health are billed using timed Current Procedural Terminology ("CPT")[2] Codes.

---

[2] CPT Codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

139. Each fifteen (15) minute unit of the CPT Codes used by the defendants requires a minimum of eight (8) defined minutes of treatment to be performed before a single unit can be properly billed.

140. When multiple units of a timed CPT Code are billed, the second (and subsequent) unit requires the full fifteen (15) minutes for the first unit, followed by at least eight (8) minutes of the second unit.

141. To properly bill for two (2) units of a timed CPT Code, at least twenty-three (23) minutes of treatment must be performed; for three (3) units, at least thirty-eight (38) minutes of treatment must be performed; and so on.

142. The following are representative examples of instances where Total Health submitted bills to Allstate for more treatment than was actually performed:

- Patient M.S. (Claim No. 0314555897) allegedly underwent thirty-five (35) minutes of therapeutic exercise on March 5, 6, 24, and 31, 2014. Thirty-five (35) minutes of therapeutic exercise would support billing for two (2) units using timed CPT Code 97110. On each of these dates, Total Health improperly and fraudulently submitted bills to Allstate representing that three (3) units of therapeutic exercise had been performed.

- Patient M.B. (Claim No. 0343863148) allegedly underwent eighteen (18) minutes of therapeutic exercise on June 11, 2015, twenty-two (22) minutes of therapeutic exercise on June 22, 2015, and thirty (30) minutes of therapeutic exercise on August 5, 2015. The June 11, 2015 and June 22, 2015 treatments support billing for one (1) unit using timed CPT Code 97110; the August 5, 2015 treatment supports billing for two (2) units. Instead, Total Health submitted for two (2) units of CPT Code 97110 on each of the first two (2) dates, and three (3) units for the alleged treatment on August 5, 2015. Most egregiously, on June 3, 2016, M.B. allegedly underwent thirty (30) minutes of therapeutic

exercise, which would amount to two (2) units of CPT Code 97110. Total Health submitted a bill to Allstate seeking payment for twenty-five (25) units of CPT Code 97110 for the June 3, 2016 date of service. To properly bill for twenty-five (25) units of treatment, M.B. would have had to have undergone at least 368 minutes of therapeutic exercise treatment.

- Patient J.S. (Claim No. 0262135213) allegedly underwent thirty-two (32) minutes of therapeutic exercise on February 14, 2014 and thirty (30) minutes of therapeutic exercise on March 10, 2014. Each of these alleged treatments would support billing for two (2) units using timed CPT Code 97110. For each date, Total Health instead submitted billing falsely claiming to have performed three (3) units of therapeutic exercise.

143.  Moreover, Total Health fabricated some or all of the records that were submitted to Allstate in order to make it appear that services were provided that were not.

144.  For example, on May 27, 2014, Total Health submitted a patient certification signed by patient R.L. (Claim No. 0322622945) for an April 28, 2014 date of service, indicating that it performed one unit of hot/cold pack, one unit of electrical stimulation, and two units of therapeutic exercise. *See* Exhibit 9.

145.  On September 5, 2014, Total Health submitted the exact patient certification form signed by patient R.L., but without a date of service listed. *See* Exhibit 10.

146.  The undated version of this patient certification form evidences that R.L. signed the form before it was actually filled out.

147.   There is no legitimate reason for Total Health to have patients sign incomplete patient certification forms.

148.   Because Total Health submitted charges to Allstate for hundreds of alleged sessions of physical therapy, each involving multiple modalities and multiple units of treatment allegedly performed, Allstate was unable to discover these fraudulent charges for services that were not actually provided until conducting the investigation that concluded shortly before the filing of this Complaint.

149.   All of the above-referenced records and bills were submitted by Total Health to Allstate through the U.S. Mail.

150.   Orchard Toxicology also submitted claims for services that were not actually provided to the patients at issue herein.

151.   For example, Orchard Toxicology submitted charges totaling $1,826.47 for alleged definitive urine drug testing performed relative to patient J.B. (Claim No. 0401393673) on July 13, 2016.

152.   The records of the physician who Orchard Toxicology claims ordered testing of J.B.'s urine specimen refer to the results of an in-office screening test, but not the definitive testing allegedly performed by Orchard Toxicology.

153.   When J.B. entered into a settlement of her insurance benefits, she was surprised to be informed of Orchard Toxicology's charge.

154.   J.B. called Orchard Toxicology and was informed that it searched its records by her name, date of birth, social security number, and that Orchard Toxicology had no record of ever performing the tests that were billed.

155.   Defendant North West Labs has also submitted claims to Allstate for urine drug testing that was not actually performed.

156.   As discussed below, North West Labs (and Orchard Toxicology) purport to perform tests for dozens of different drugs and analytes on each urine specimen received.

157.   For each urine specimen allegedly tested by North West Labs at issue herein, North West Labs submitted charges to Allstate using the same twenty-six (26) CPT Codes, several of which describe testing or multiple drugs/analytes in the same class of substance.

158.   However, the laboratory reports submitted by North West Labs represent to have tested the urine specimens for differing numbers of drugs and analytes, ranging from 62 to 67 different purported results recorded.

159.   This inconsistency in the drugs/analytes purportedly tested while the bills submitted to Allstate remained constant resulted in the submission of charges for tests that were not actually performed.

160.   For example, North West Labs submitted charges to Allstate claiming to have tested urine specimens provided by patients T.N. (Claim No. 0451998420)

on August 5, 2017; D.D. (Claim No. 0439360462) on August 7, 2017; and A.A. (Claim No. 0469650856) on August 11, 2017 for serotonergic antidepressants.

161.  However, the laboratory reports submitted to Allstate by North West Labs relative to patients T.N., D.D., and A.A. do not contain any purported results of testing for serotonergic antidepressants.

162.  Thus, the charges submitted to Allstate for testing for serotonergic antidepressants relative to the urine specimens of T.N., D.D., and A.A. were for services that were not actually performed.

163.  Moreover, North West Labs has also repeatedly submitted bills and a laboratory report for urine drug testing allegedly performed on the same urine specimens, on the same dates, as a separate company called Tox Testing, Inc.

164.  North West Labs claims to have performed definitive/quantitative urine drug testing on the same urine specimens as Tox Testing, Inc. for each of the following patients:

- T.N. (Claim No. 0451998420), collected on August 5, 2017 by Mustafa Shukr, M.D. ("Shukr").

- A.A. (Claim No. 0469650856), collected on August 11, 2017 by Christina Kimbrough, M.D. ("Kimbrough").

- B.T. (Claim No. 0453484032), collected on August 10, 2017 by Shukr.

- D.D. (Claim No. 0439360462), collected on August 7, 2017 by Shukr.

165.   It is not possible that both North West Labs and Tox Testing, Inc. performed definitive/quantitative testing on the same urine specimens provided by the above-listed patients.

166.   Notably, the purported testing performed by Tox Testing, Inc., which is located in the same building as the practice of Shukr and Kimbrough, was for different drugs/analytes, and was billed at less than the charges submitted by North West Labs.

167.   North West Labs submitted charges to Allstate using twenty-six (26) different CPT codes for each of the tests it purportedly performed on the urine specimens of T.N., A.A., B.T., and D.D.

168.   North West Labs and Tox Testing, Inc. each claim to have performed definitive/quantitative testing to detect the presence of barbiturates, benzodiazepines, cannabinoids, cocaine, methadone, amphetamines, buprenorphine, opioids, and oxycodone in the urine specimens provided by T.N., A.A., B.T., and D.D.

169.   Tox Testing, Inc., claims to have tested the urine specimens for just one (1) additional substance, alcohols.

170.   However, North West Labs submitted charges to Allstate for purported testing of twelve (12) additional drugs/analytes that were not claimed to have been tested by Tox Testing, Inc.

171.   To the extent that North West Labs performed any testing on the urine specimens of T.N., A.A., B.T., and D.D., the excessive additional testing it performed could not have been justified by the same prescription that was satisfied by testing for eleven (11) fewer substances by Tox Testing, Inc.

172.   The defendants' pattern of mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered.

173.   All of the claims submitted by the defendants to Allstate through the U.S. Mail seeking reimbursement for treatment that never occurred are fraudulent.

174.   Allstate is not required to compensate the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recoup any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

## VII.   ILLEGAL SOLICITATION AND PAYMENT OF KICKBACKS

### A.   PAYMENT OF KICKBACKS FOR REFERRALS

175.   After forming the Defendant Facilities, Ahmad and Elias went from receiving kickbacks to paying kickbacks.

176.   Michigan law prohibits the acceptance of kickbacks on medical or surgical services and the promotion for personal gain of an unnecessary drug, device, treatment, procedure, or service.  Mich. Comp. Laws § 333.16221(d)(ii) and (e)(iii).

30

177.   Payment of kickbacks incentivized providers to refer patients to the Defendant Facilities for medically unnecessary and excessive MRI scans, urine drug testing, and physical therapy.

178.   One of the methods used by Complete Imaging to pay kickbacks to referring physicians is entering into "marketing services agreements" with such physicians.

179.   The Complete Imaging Marketing Services Agreement provides that payment is to be made to the referring provider at a set amount "per Specimen received by Complete Imaging."

180.   Payments made at a set rate for each patient referral made (or specimen collected) is the quintessential example of an illegal kickback.

181.   Further, "specimen" is a term used in the urine drug testing business, not in relation to a patient seeking MRI imaging, suggesting that the Complete Imaging Marketing Services Agreement is a revised version of the marketing services agreement used by Orchard Toxicology and North West Labs, and that Orchard Toxicology and North West Labs also pay referring physicians kickbacks on a per referral basis.

182.   Moreover, when the defendants presented potential referring providers with the terms of the marketing services agreement, they dispensed with the fiction that payments would be made for anything other than patient referrals.

31

183.   Instead, the defendants explicitly discussed with potential referring providers that compensation would be made solely based on the number of patients referred, and they offered upfront payments to entice such potential referring providers to sign the agreements.

184.   The defendants also made subtler kickback payments to their referral sources.

185.   As discussed above, Sam Elia repeatedly shared residential addresses with Ahmad and Elias.

186.   Ahmad and Sam Elia attended lavish vacations and parties together.

187.   In the context of healthcare services, a kickback is any compensation of any kind which is provided, directly or indirectly, in exchange for a referral for services.

188.   To the extent that use of residences, travel expenses, and other entertainment expenses were provided to Sam Elia without charge or at less than market value, such in-kind compensation constitutes kickbacks and unlawful fee splitting.

189.   All of the payments made by the defendants to referring providers constitute kickbacks, notwithstanding the defendants' attempt to characterize such payments as "marketing."

190.   As discussed above, the defendants' use of kickbacks in relation to referrals of alleged motor vehicle accident victims has been a consistent practice for years.

191.   Further, when Complete Imaging applied for a CON to acquire an MRI route host site in 2015, it retained the services of a consultant named Phillip Young ("Young").

192.   Young formerly owned and operated an MRI facility called Universal Imaging, Inc. ("Universal Imaging").

193.   In November 2012, Young and Universal Imaging entered into an agreement setting a False Claims Act *qui tam* action alleging that they paid kickbacks to physicians in exchange for MRI referrals.

194.   At least fourteen (14) different physicians also entered into settlements whereby they made payments based on amounts that had been paid to them by Complete Imaging's consultant Young in exchange for MRI referrals.

195.   All claims submitted by the defendants to Allstate through the U.S. Mail seeking reimbursement for MRI services, urine drug testing, and physical therapy treatment that resulted from illegal kickback payments are fraudulent and Allstate is not required to compensate the defendants for such services.

## B.    ILLEGAL SOLICITATION OF MOTOR VEHICLE ACCIDENT VICTIMS

196.    Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

197.    Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

198.    It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, or use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503.

199.    Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157.

200.    As discussed above, prior to forming the Defendant Facilities, Ahmad and Elias were runners who were paid hundreds of thousands of dollars for making referrals to healthcare facilities.

201.   In addition to direct kickback payments to referral sources, patients at issue herein were referred to the Defendant Facilities as a direct result of illegal solicitation.

202.   At least one patient, J.S. (Claim No. 0262135213), has testified that he was directly solicited by defendant Elias.

203.   Because the scheme at issue herein involves the alleged provision of treatment and services that require a physician prescription, the defendants primarily relied on solicitation by the physicians to whom they paid kickbacks and otherwise arranged for patient referrals to conduct the illegal solicitation of motor vehicle accident victims.

204.   As described in the exemplars set forth below in section VII.E, patients at issue in this Complaint were illegally solicited and directed to present for an evaluation at the office of a physician, who then made referrals to some or all of the Defendant Facilities.

205.   Ahmad and Elias were aware of the illegal solicitation activity utilized by these physicians, and intentionally cultivated relationships with such physicians to obtain referrals to the Defendant Facilities.

206.   Not surprisingly, a substantial number of the patients at issue in this Complaint were referred to the Defendant Facilities by the same physicians and medical practices.

35

## C.   THE DEFENDANTS' REFERRAL SOURCES

207.   Many of the patients who were allegedly treated and tested by the Defendant Facilities were referred by providers who are known to have histories of abusing the healthcare system.

208.   Despite the publicly available information regarding these providers' participation in various healthcare fraud schemes, the defendants performed hundreds of tests and treatments these physicians allegedly prescribed without questioning the medical necessity thereof.

209.   The physician referral data reported to the State of Michigan by Complete Imaging in 2016 illustrates the network of unscrupulous referral sources developed by Ahmad and Elias.

210.   In 2016, the physician who referred the most MRIs to Complete Imaging was Johnny Ray Trotter, M.D. ("Trotter").

211.   Trotter referred 74 patients for 201 MRIs to Complete Imaging in 2016, which amounted to 23.2% of the total MRIs performed by Complete Imaging for the year.

212.   On April 28, 2017, Trotter was convicted on four (4) felony counts related to a healthcare fraud scheme involving charges of more than $28 million for procedures that he did not actually perform, as described in the superseding indictment attached hereto at Exhibit 11.

36

213.  Among the methods used by Trotter to perpetrate the fraud was the use of multiple entities to conceal his involvement, which is one of the same tactics employed by defendants Ahmad and Elias.

214.  Trotter was indicted in relation to this healthcare fraud scheme in 2014.

215.  Thus, the defendants knew or should have known that referrals from Trotter should have been scrutinized for propriety and medical necessity in light of the criminal accusations he faced.

216.  Sixty-four of the 74 patients referred to Complete Imaging by Trotter in 2016 underwent MRIs of multiple body parts at the same visit, and more than half received MRIs of three (3) or more body parts.

217.  As discussed further below, it is exceedingly rare for patients to undergo such a high number of MRIs when referred for legitimate medical purposes.

218.  The physician who referred the second most MRIs to Complete Imaging in 2016 was Frances Madden, M.D. ("Madden").

219.  Madden referred 51 patients for 98 MRIs to Complete Imaging in 2016, which amounted to 11.3% of the total MRIs performed by Complete Imaging for the year.

220.  In 2011, Madden was named as a defendant in a False Claims Act lawsuit filed by a whistleblower who reported that Madden's former employer,

Lakeshore Spine & Pain, P.C., paid illegal kickbacks to medical practitioners to induce patient referrals.

221.    On May 17, 2015, Madden entered into a settlement agreement with the United States government whereby she agreed to pay $150,000 and was barred from submitting any claims to Medicare, Medicaid, and all other federal health care programs for a period of three (3) years. *See* Exhibit 12.

222.    The physicians who referred the third most MRIs to Complete Imaging in 2016 were Muhammad Awaisi, M.D. ("Awaisi") and physicians he employed at his two (2) medical practices.

223.    Sam Hakki, M.D. ("Hakki"), one of the physicians employed by Awaisi who made MRI referrals to Complete Imaging, has testified that when he ordered MRIs he wrote the prescription on a generic pad and Awaisi and his staff chose the facility to which patients were sent.

224.    Thus, Awaisi controlled the MRI referrals from his clinics even when the prescriptions were signed by subordinate practitioners.

225.    Awaisi and physicians associated with his clinics referred 39 patients for 93 MRIs to Complete Imaging in 2016, which amounted to 10.7% of the total MRIs performed by Complete Imaging for the year.

226.    Awaisi formerly practiced medicine in Massachusetts until his license was revoked on June 7, 2006.

227.   According to a consent order agreed to by Awaisi, his license was revoked after he improperly accessed records for more than 250 emergency room patients at Baystate Medical Center, where he worked as an associate physician.

228.   Awaisi used the contact information of those patients to solicit them and falsely state that they had been referred for physical therapy at U.S. Rehab, an entity he owned and operated.

229.   The Massachusetts Board of Registration in Medicine concluded that "[Awaisi] has engaged in conduct that undermines the public confidence in the integrity of the medical profession" and "[Awaisi] has practiced medicine deceitfully, or engaged in conduct which has the capacity to deceive or defraud in violation of [state regulations]." *See* Exhibit 13.

230.   Together, the physicians listed above, each of whom have a documented history of association with or participation in improper referral and billing schemes, accounted for nearly half of the total MRIs performed by Complete Imaging in 2016.

231.   Trotter, Madden, and Awaisi and his associates also accounted for a substantial number of the referrals made for the patients at issue herein for urine drug testing performed by Orchard Toxicology and North West Labs and physical therapy provided by Total Health.

232.   The physicians who referred the largest number of patients at issue herein to Orchard Toxicology for urine drug testing were Siva Sripada, D.O. ("Sripada") and his associates at Midwest Medical Associates, Inc. ("Midwest Medical").

233.   Sripada refers so many urine specimens to Orchard Toxicology for testing, Orchard Toxicology assigned a "handler" to sit in his office and transport specimens after they are collected.

234.   Midwest Medical is alleged to have used solicitors to purchase police reports and illegally contact motor vehicle accident victims by phone in a separate RICO action currently being litigated in this District.

235.   One of the owners of Midwest Medical is Mark Radom ("Radom").

236.   Radom was also an owner of an MRI facility named Horizon Imaging, LLC ("Horizon Imaging"), which was part of the same network of medical facilities that paid Ahmad and Elias hundreds of thousands of dollars in kickbacks for patient referrals, as discussed above.

237.   Thus, an owner of one of the primary sources for the patient referrals the Defendant Facilities depended upon has a direct connection to Ahmad and Elias's practice of using kickbacks to generate charges for medically unnecessary treatment and testing.

238.   The participation of unscrupulous providers to refer patients for medically unnecessary MRI imaging, urine drug testing, and physical therapy was crucial for the implementation of the defendants' scheme to defraud Allstate.

### D.   IMPROPER ATTORNEY REFERRALS

239.   As discussed above, the defendants relied heavily on the law firm of Elia & Ponto to send patients both directly to the Defendant Facilities and to physicians who made referrals to the Defendant Facilities.

240.   Patients at issue herein were also referred to the Defendant Facilities by other personal injury attorneys.

241.   Referrals from any sources, including attorneys, that are secured through the payment of kickbacks or fee-splitting are illegal and improper.

242.   Michigan's anti-solicitation laws also apply equally to solicitation conducted through attorneys.

243.   It is improper for an attorney to direct the medical treatment of a patient, including the issuance of prescriptions for treatment and disability certificates, as is documented by the emails sent by Elias and Sam Elia discussed above.

244.   It is never proper for an attorney to make a referral of a patient for MRI imaging or urine drug testing, both of which require a prescription by a licensed physician, or for the Defendant Facilities to accept such a referral from a lay attorney.

41

245.   One example of improper attorney influence on the performance of MRI testing involves one of Complete Imaging's radiologists, Vivek Sehgal, M.D. ("Sehgal").

246.   On June 23, 2017, Ram Gunabalan M.D. ("Gunabalan"), the owner of a competing MRI facility called Bio-Magnetic Resonance, Inc. ("Bio-Magnetic"), signed a fifty-page affidavit detailing more than two (2) decades of fraudulent healthcare billing schemes targeting automobile insurers in which he was involved (the "Gunabalan affidavit").

247.   The Gunabalan affidavit states that Sehgal was hired by Bio-Magnetic in December 2009.

248.   The Gunabalan affidavit further states that within weeks of being hired, Sehgal met with personal injury attorney Michael Morse ("Morse") regarding Morse's demand that Bio-Magnetic "produce abnormal [MRI] results regardless of the actual condition of the patient."

249.   Supporting the averments of the Gunabalan affidavit pertaining to Sehgal are at least five (5) emails attached thereto, each sent by Morse to Sehgal and Gunabalan and attaching MRI reports created by Sehgal that contain normal MRI findings.

250.   Several of the patients at issue herein were represented by Morse.

42

251.   On behalf of Complete Imaging, Sehgal interpreted MRI images taken of patients at issue herein as recently as May 2015, well after he and Morse allegedly came to an agreement regarding over reading MRI images to produce abnormal results.

### E.   SPECIFIC EXAMPLES OF IMPROPER REFERRALS

252.   Patients of the Defendant Facilities have confirmed unlawful solicitation and improper referrals that directly led to the MRI imaging, urine drug testing, and physical therapy that is the subject of this Complaint.

253.   The following representative patients exemplify the fact and extent of the defendants' alleged treatment of patients who were illegally referred.

### 1.   Patient J.S. (Claim No. 0262135213)

254.   Patient J.S. was allegedly involved in a motor vehicle accident on October 12, 2012.

255.   J.S. testified that following his alleged accident an individual named Omar came to his home to solicit him to undergo physical therapy at Total Health.

256.   J.S. testified that Omar worked at Total Health.

257.   The individual named Omar who solicited J.S. is defendant Elias.

258.   After being solicited by Elias, J.S. was called by a representative of Bluebird Transportation, who informed that he was coming to pick J.S. up for physical therapy.

259.   J.S. allegedly underwent physical therapy at Total Health from February 1, 2013 through March 10, 2014.

260.   Total Health submitted charges to Allstate totaling $19,415 for this treatment that was improperly directed by a layperson and was the direct result of illegal solicitation.

261.   Total Health submitted claims for payment and accompanying medical records relative to J.S. to Allstate through the U.S. Mail seeking reimbursement for unlawful and fraudulent treatment, upon which Allstate relied in adjusting the claims.

262.   Allstate is not required to pay Total Health for the unlawful and fraudulent treatment that was allegedly rendered to J.S., and is entitled to a return of monies it paid to Total Health for this unlawful and fraudulent treatment.

### 2.   Patient M.A. (Claim No. 0326050457)

263.   Patient M.A. was allegedly involved in a motor vehicle accident on May 8, 2014.

264.   M.A. testified that after the alleged accident, an individual named Arak Ishaq came to her front door and stated that he had heard M.A. had been in an accident.

265.    Arak Ishaq is the owner of Bluebird Transportation, the company used by Omar Elias to transport patients whom he solicited and directed to medical treatment.

266.    M.A. reported that Ishaq arranged for her to see Jiab Suleiman, M.D. ("Suleiman").

267.    Suleiman did not record a neurological examination, did not make attempts at conservative treatment, and recorded only subjective complaints of pain.

268.    Suleiman nevertheless ordered MRIs to be performed of M.A.'s cervical and lumbar spine.

269.    These medically unnecessary MRIs ordered by Suleiman were performed at Complete Imaging on July 5, 2014 and July 13, 2014, respectively.

270.    On February 12, 2015, M.A. was allegedly examined by Hakki, who was at that point employed at a pain clinic owned by Awaisi.

271.    Hakki did not perform a physical examination, but noted that he ordered MRIs of M.A.'s cervical, thoracic, and lumbar spine.

272.    Inexplicably, an MRI prescription allegedly signed by Hakki on the date of his evaluation orders a right knee and bilateral shoulder MRIs.

273.    Hakki did not examine M.A.'s shoulders.

274.    The bill for Hakki's alleged evaluation was not signed until June 22, 2015.

275.   M.A. had allegedly presented to Complete Imaging on June 20, 2015 for MRIs of her right knee and right shoulder, despite having no other treatment since Hakki allegedly ordered these MRIs more than four (4) months prior.

276.   M.A. never returned to any physician after these MRIs were allegedly performed on June 20, 2015.

277.   Complete Imaging knew or should have known that MRIs ordered more than four (4) months before the patient actually presented for the imaging required further investigation.

278.   Had Complete Imaging conducted an inquiry, it would have found that Hakki never performed an examination justifying the order of these MRIs.

279.   For the four (4) medically unnecessary MRIs performed, if at all, as a direct result of illegal solicitation, Complete Imaging sought reimbursement of $19,400 from Allstate.

280.   Complete Imaging had an obligation to confirm that the MRIs performed of M.A. were lawful and medically necessary.

281.   None of the MRIs performed on M.A. by Complete Imaging were reasonable or medically necessary and all resulted from illegal solicitation.

282.   Complete Imaging submitted claims for payment and accompanying medical records relative to M.A. to Allstate through the U.S. Mail seeking

reimbursement for unlawful, fraudulent, unreasonable, and unnecessary imaging, upon which Allstate relied in adjusting the claims.

283.    Allstate is not required to pay Complete Imaging for the fraudulent, unlawful, unreasonable, and unnecessary imaging that was rendered to M.A., and is entitled to a return of monies it paid to Complete Imaging for these unlawful and medically unnecessary scans.

### 3.    Patient M.A. (Claim No. 0391127271)

284.    Patient M.A. was allegedly involved in a motor vehicle accident on November 8, 2015.

285.    M.A. underwent MRI imaging of his lumbar spine, thoracic spine, cervical spine, and left shoulder at Complete Imaging on December 18, 2015.

286.    Complete Imaging claims that each of these MRIs was ordered by Awaisi.

287.    Neither Awaisi nor any clinic he owns or is associated with has ever submitted a medical record or bill to Allstate relative to M.A.

288.    M.A. reported to his physical therapist that his treatment was actually directed by his attorney.

289.    Upon information and belief, Awaisi provided M.A.'s attorney with signed prescriptions and disability certificates without actually performing any examination.

290.   Complete Imaging could not have undertaken its obligation to confirm that the MRIs supposedly ordered by Awaisi were medically necessary, as no such records exist.

291.   For the four (4) medically unnecessary MRIs performed in the absence of any supporting medical record, Complete Imaging sought reimbursement of $20,100 from Allstate.

292.   Complete Imaging had an obligation to confirm that the MRIs performed of M.A. were medically necessary and were actually ordered by a physician.

293.   None of the MRIs performed on M.A. by Complete Imaging were reasonable or medically necessary.

294.   Complete Imaging submitted claims for payment and accompanying medical records relative to M.A. to Allstate through the U.S. Mail seeking reimbursement for fraudulent, unreasonable, and unnecessary imaging, upon which Allstate relied in adjusting the claims.

295.   Allstate is not required to pay Complete Imaging for the fraudulent, unreasonable, and unnecessary imaging that was rendered to M.A., and is entitled to a return of monies it paid to Complete Imaging for these medically unnecessary scans.

### 4.    Patient R.T. (Claim No. 0393986864)

296.    Patient R.T. was allegedly involved in a motor vehicle accident on December 6, 2015.

297.    R.T. reported to Allstate that within a day of the alleged accident he received at least two (2) calls from people who claimed to have heard about his accident and would direct his treatment.

298.    One of the calls placed to R.T. was from Kinetix Rehab Services, Inc.; the other was from an individual who identified himself as "Mr. Ray."

299.    R.T. began a course of physical therapy at Kinetix Rehab Services, Inc. on December 7, 2015, the day after his alleged motor vehicle accident.

300.    On December 21, 2015, R.T. was evaluated by Madden, at least in part because a physician prescription was needed to continue treatment by the soliciting physical therapist, as discussed further *infra*.

301.    Madden noted that R.T. "cannot describe his back where the pain is."

302.    Madden found normal 5/5 muscle strength in all relevant muscles, and noted that her orthopedic examination of all areas of R.T.'s spine was "unremarkable."

303.    Madden nevertheless ordered MRIs of R.T.'s cervical spine, thoracic spine, lumbar spine, left hip, and brain.

304.   The prescription given by Madden to R.T. was on a preprinted Complete Imaging form, thus depriving him of the option to have the MRIs performed at a facility of his choice.

305.   The prescription issued by Madden on December 21, 2015, less than thirty (30) days after the alleged accident, also included the phone number of R.T.'s attorney.

306.   On January 2, 2016, Complete Imaging performed the medically unnecessary spinal MRIs ordered by Madden.

307.   Complete Imaging provided no explanation as to why it disregarded Madden's direction to perform medically unnecessary brain and left hip MRIs.

308.   For the three (3) medically unnecessary MRIs performed as a direct result of illegal solicitation, Complete Imaging sought reimbursement of $15,600 from Allstate.

309.   Complete Imaging had an obligation to confirm that the MRIs performed of R.T. were lawful and medically necessary.

310.   None of the MRIs performed on R.T. by Complete Imaging were reasonable or medically necessary.

311.   Complete Imaging submitted claims for payment and accompanying medical records relative to R.T. to Allstate through the U.S. Mail seeking

reimbursement for fraudulent, unreasonable, and unnecessary imaging, upon which Allstate relied in adjusting the claims.

312.   Allstate is not required to pay Complete Imaging for the fraudulent, unlawful, unreasonable, and unnecessary imaging that was rendered to R.T.

### 5.    Patient M.S. (Claim No. 0314555897)

313.   Patient M.S. was allegedly involved in a motor vehicle accident on January 28, 2014.

314.   M.S. was represented by Elia & Ponto in relation to this alleged accident.

315.   M.S. was allegedly referred to Total Health by Victor Al-Matchy, M.D. ("Al-Matchy").

316.   However, the first date of service billed to Allstate by Al-Matchy relative to M.S. was March 11, 2014, nearly a month after Total Health began allegedly providing physical therapy.

317.   If Al-Matchy actually evaluated M.S. before she began treatment at Total Health, a record of such evaluation has never been produced to Allstate.

318.   As discussed above, Total Health submitted bills to Allstate for multiple alleged treatments that were not actually rendered to M.S.

319.   Al-Matchy subsequently referred M.S. for MRIs of her cervical spine, thoracic spine, and lumbar spine, all of which were performed at Complete Imaging on July 27, 2014.

320.   M.S. later disclosed to an independent medical examiner that she had been directed to Al-Matchy by her attorneys, Elia & Ponto.

321.   The referral of M.S. to Al-Matchy by Elia & Ponto was merely a way to obtain the necessary prescriptions for the physical therapy at Total Health and the MRI imaging at Complete Imaging.

322.   In reality, M.S.'s course of medical treatment was improperly dictated by Elia & Ponto.

323.   Total Health and Complete Imaging submitted claims for payment and accompanying medical records relative to M.S. to Allstate through the U.S. Mail seeking reimbursement for unlawful, fraudulent, unreasonable, and unnecessary imaging and treatment, upon which Allstate relied in adjusting the claims.

324.   Allstate is not required to pay Total Health or Complete Imaging for the fraudulent, unlawful, unreasonable, and unnecessary imaging and treatment that was rendered to M.S. (if at all), and is entitled to a return of monies it paid to Total Health and Complete Imaging for such imaging and treatment.

## 6.    Patient M.N. (Claim No. 0363464710)

325.    Patient M.N. was allegedly involved in a motor vehicle accident on March 30, 2015.

326.    M.N. was represented by Elia & Ponto in relation to this alleged accident.

327.    On April 15, 2015, M.N. was evaluated by Sripada, who immediately referred M.N. for an MRI of his lumbar spine, which was performed at Complete Imaging on April 18, 2016 and interpreted by radiologist Sehgal.

328.    Sripada also collected a urine specimen from M.N. on April 15, 2015, which was allegedly tested by Orchard Toxicology for approximately 70 different substances, despite M.N. not being prescribed any medications at the time the specimen was collected and Sripada not indicating any concern for drug abuse or diversion.

329.    On May 7, 2015, M.N. began a course of physical therapy with Total Health.

330.    The single evaluation performed by Sripada on April 15, 2015 resulted in referrals to each of the Defendant Facilities that existed at the time, which were the only medical providers with whom M.N. treated in relation to his alleged accident.

331.   M.N. later disclosed to an independent medical examiner that he was referred to Sripada by his attorneys, Elia & Ponto.

332.   The referral of M.N. to Sripada by Elia & Ponto was merely a way to obtain the necessary prescriptions for the physical therapy at Total Health, urine drug testing by Orchard Toxicology, and MRI imaging at Complete Imaging.

333.   In reality, M.N.'s course of medical treatment was improperly dictated by Elia & Ponto.

334.   Total Health, Orchard Toxicology, and Complete Imaging submitted claims for payment and accompanying medical records relative to M.N. to Allstate through the U.S. Mail seeking reimbursement for unlawful, fraudulent, unreasonable, and unnecessary imaging and treatment, upon which Allstate relied in adjusting the claims.

335.   Allstate is not required to pay Total Health, Orchard Toxicology, or Complete Imaging for the fraudulent, unlawful, unreasonable, and unnecessary imaging and treatment that was rendered to M.N. (if at all), and is entitled to a return of monies it paid to Total Health and Complete Imaging for such imaging and treatment.

## VIII.  <u>FRAUDULENT AND UNNECESSARY MEDICAL TREATMENT</u>

336.   The defendants' willingness to bill Allstate for services that were (1) never rendered and (2) not lawfully provided demonstrates their willingness to also bill for treatment that was unnecessary, excessive, and unreasonable.

337.   Moreover, but for the defendants' illicit solicitation, as discussed *supra*, the patients at issue herein would not have sought treatment with or by the defendants.

338.   The defendants' goal in treating patients was to perform as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills submitted to Allstate.

339.   As set out below, the defendants grossly overutilized physical therapy, MRI scans, and urine drug testing in wanton disregard for standards of care.

340.   The defendants' treatment violated established standards of care in the medical community, as the vast majority of testing, diagnostics, and treatment were not indicated, redundant, excessive, and repeated without any objective documented benefit to patients.

341.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the

filing of this Complaint, including identification of the defendants' pattern of overtreatment.

342.   The unnecessary treatment rendered by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 4.

343.   All of the claims submitted by the defendants to Allstate through the U.S. Mail seeking reimbursement for unnecessary, unlawful, and unreasonable treatment are fraudulent.

### A.   MEDICALLY UNNECESSARY MRIs

#### 1.   Standard of Care for MRI Imaging

344.   Complete Imaging had a responsibility to ensure that MRIs were properly ordered, but it intentionally chose not to do so in order to maximize the amount of charges it could submit to Allstate

345.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

346.   According to the ACR, an MRI should only be ordered after the physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

347.   For musculoskeletal joint MRIs, a basic orthopedic examination of the applicable part of the body, including documentation of range of motion and response to provocative maneuvers, should be performed and documented in the medical record.

348.   The ACR's practice parameters also state that a basic neurological examination should be done and recorded prior to an MRI of the brain or spinal region.

349.   Prior to referring a patient for an MRI to rule out damage to spinal nerve roots or intervertebral discs, a physician should perform a basic neurological examination and document the findings of such testing, including the results of muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light touching).

350.   The ACR promulgates specific "Appropriateness Criteria" rating the appropriateness of various types of imaging studies in light of a patient's presenting symptoms and history.

351.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that MRIs are "usually not appropriate" as the initial study for patients with chronic pain, including when the patient has a history of trauma or prior surgery.

352.   Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there

is documented "[p]ersistant pain following failure of conservative management only in select cases."

353.   Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "may be appropriate" (emphasis added) to perform an MRI, and again only when pain persists following failure of conservative care.

354.   The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

355.   MRIs should not be ordered in violation of the ACR Practice Parameters unless there is an overriding clinical reason in the specific case and that reason must be documented in the patient's medical record.

356.   The physicians who made referrals to Complete Imaging never documented an overriding clinical reason for the MRIs ordered outside of the ACR Practice Parameters.

357.   The ACR also provides that MRI prescription forms should provide sufficient information to demonstrate the medical necessity of the MRI and allow for its proper performance and interpretation.

358.   If the prescription does not contain sufficient information to demonstrate the medical necessity of the MRI and allow for its proper performance and interpretation, the radiologist should contact the referring practitioner (who

should be familiar with the patient's clinic problem or question) to obtain the missing information.

359.   Only upon receiving such information is it appropriate for the radiologist to interpret the study and issue a radiology report setting forth the professional findings and interpretation.

360.   MRI findings may be misleading if not closely correlated with the clinical history, clinical examination, or physiologic tests.

361.   The ACR mandates that the interpreting physician "shall have the responsibility for all aspects of the study including, but not limited to, reviewing all indications for the examination . . . ."

362.   Complete Imaging is accredited by the ACR, and thus has certified compliance with ACR accreditation requirements.

363.   Thus, Complete Imaging cannot disclaim the applicability of the ACR's guidelines.

364.   Nevertheless, the MRIs at issue in this Complaint routinely lack any documentation of why the MRI was recommended or medically necessary, much less sufficient information to allow for proper performance and interpretation of the MRIs prescribed by referring physicians.

365.   Pursuant to the ACR guidelines, it is the responsibility of Complete Imaging to assure that all MRIs referred are proper.

366.    As set forth below, rather than perform the duties required by the ACR, the defendants routinely performed excessive and medically unnecessary MRIs in order to increase the amount of reimbursement sought from Allstate.

367.    The representative patient exemplar claims set forth in Section VIII.A.4 below detail several of the medically unnecessary MRIs that were performed by Complete Imaging in violation of the ACR Practice Parameters.

## 2.    MRIs Performed During Initial Stages of Treatment

368.    MRIs at issue herein were also routinely ordered at the onset of the patient's treatment, thus evidencing that MRIs were resorted to as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

369.    Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."    Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012).

370.    Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id. at 945.

60

371.   At the onset of a soft-tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurological injuries, including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

372.   Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

373.   Complete Imaging routinely performed MRIs of patients who had only just initiated treatment.

374.   At least thirty (30) separate patients at issue in this Complaint underwent MRIs at Complete Imaging within a month of the occurrence of an alleged motor vehicle accident.

375.   It is not possible that patients who underwent MRIs just days or weeks after their alleged motor vehicle accidents attempted conservative treatment as required by the ACR before resorting to MRI imaging.

376.   The patients at issue herein who received MRIs at Complete Imaging within the first days and weeks after their alleged motor vehicle injuries had non-emergent medical conditions, not the type of fracture or neurological injury that would justify overriding the ACR's directives to attempt conservative treatment before imaging.

### 3.   Excessive MRI Scans

377.   In addition to performing MRIs as soon as possible after an alleged accident, Complete Imaging also sought to maximize the amount of the charges submitted to Allstate by performing far more MRIs than were medically necessary.

378.   MRIs should be limited to the symptomatic body part and it is uncommon to order MRIs on more than one region.

379.   The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in 2016, which documents that just 12.5% (105,335 of 841,236) of all patients underwent MRIs of multiple body parts during the same visit.

380.   This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

381.   Complete Imaging never provided MRIs to patients seeking emergent diagnosis and treatment.

382.   By comparison, in 2016, Complete Imaging performed multiple MRIs at more than five (5) times the statewide average, with 67.7% of patients receiving multiple MRIs.

383.   Because the defendants intentionally targeted automobile insurers for excessive and medically unnecessary MRIs, the patients at issue in this Complaint

received multiple MRIs at an even higher rate; 76% of patients insured by Allstate received MRIs of more than one body part at Complete Imaging.  *See* Exhibit 1.

384.   The extreme number of MRIs per patient performed by Complete Imaging is illustrated on the chart below:



385.   Of the 129 patients at issue herein who purportedly underwent MRIs at Complete Imaging, 54 patients had MRIs of three (3) or more body parts.  *See* Exhibit 1.

386.   Scans of multiple body parts in the number and at the rate performed by Complete Imaging are exceptionally rare.

387.   Out of 841,263 MRIs reported by all providers to the State of Michigan in 2016, only 484 patients received MRIs of five (5) or more body parts on the same date of service.

388.   Stated differently, 0.05% of all MRIs conducted in the State of Michigan in 2016 involved imaging five (5) or more body parts of the same patient on the same date of service.

389.   In 2016, Complete Imaging performed MRIs of five (5) or more body parts of the same patient at the same visit 58 times more often than this statewide average, with twelve (12) of the 409 patients purportedly imaged receiving this highly excessive number of MRI scans.

390.   Moreover, Complete Imaging often performed MRIs of the same patient that were just days or weeks apart, which obscures the true number of MRIs performed per patient by Complete Imaging in the data reported to the State of Michigan.

391.   Patients at issue herein underwent as many eight (8) separate MRIs at Complete Imaging, with at least fifteen (15) patients who underwent five (5) or more MRIs and an additional sixteen (16) patients who underwent four (4) MRIs at Complete Imaging.  *See* Exhibit 1.

392.   As discussed above, Ahmad and Elias intentionally cultivated relationships with unscrupulous providers like Trotter, Madden, and Awaisi who they knew would refer patients for multiple medically unnecessary MRIs.

### 4.    <u>Exemplar Claims</u>

393.    The defendants' fraudulent billing for medically unnecessary MRI scans is exemplified by the following representative patients.

### 1.    **Patient N.S. (Claim No. 0431326032)**

394.    Patient N.S. was allegedly involved in a motor vehicle accident on October 3, 2016.

395.    N.S., who was twenty-three (23) years old at the time of the alleged accident, was evaluated by Trotter on October 17, 2016.

396.    Trotter did not perform a neurological examination and his musculoskeletal examination was limited to recording N.S.'s subjective pain complaints and noting alleged "decreased range of motion described as sharp."

397.    Despite a lack of any findings supporting the use of MRI imaging, and before attempting any type of treatment, Trotter ordered MRIs of N.S.'s lumbar spine, thoracic spine, cervical spine, and bilateral hips.

398.    Four (4) days later, on October 21, 2016, N.S. presented to Complete Imaging where she underwent all five (5) medically unnecessary MRIs ordered by Trotter.

399.    Although Complete Imaging submitted bills to Allstate for bilateral hip MRIs, it submitted just one radiological report noting that a "[m]ultiplanar,

multisequence MRI of the right hip is performed" but only "[i]mages of the left hip and pelvis."

400.   The substance of the report also focuses on the right hip, and notes findings only as to "the visualized left hip."

401.   At N.S.'s follow-up appointment with Trotter on November 1, 2016, he noted only an MRI of the right hip.

402.   Thus, it is unclear whether Complete Imaging actually performed two (2) separate MRIs as reflected by the bills submitted to Allstate.

403.   To the extent the October 21, 2016 MRIs were actually performed, they were each unreasonable and medically unnecessary.

404.   On January 13, 2017, N.S. returned to Complete Imaging for bilateral shoulder MRIs.

405.   The January 13, 2017 bilateral MRIs resulted in two (2) separate MRI reports, unlike the alleged bilateral hip MRIs performed on October 21, 2016.

406.   Complete Imaging claimed that the January 13, 2017 MRIs were ordered by Trotter, but Trotter's records never mention the need for such MRIs and he never acknowledged that such MRIs were performed or reviewed the results.

407.   After Trotter was convicted of healthcare fraud, N.S. was examined by Rabinder Bhatti, D.O. ("Bhatti") on April 28, 2017.

408.   Bhatti noted that bilateral shoulder MRIs had been performed, but that he only had the report for the right shoulder MRI.

409.   Rather than attempting to obtain a copy of the report or images of the MRI of N.S.'s left shoulder that was taken just three (3) months prior, a repeat left shoulder MRI was ordered.

410.   Complete Imaging performed this repeat left shoulder MRI, which was ordered for no reason other than that the referring provider could not locate the report of the left shoulder MRI Complete Imaging performed three (3) months prior, on April 28, 2017.

411.   None of the MRIs of N.S.'s shoulders, to the extent they were performed at all, were medically necessary.

412.   For the eight (8) medically unnecessary MRIs allegedly performed on N.S., Complete Imaging sought reimbursement of $38,100 from Allstate.

413.   Complete Imaging had an obligation to confirm that the MRIs performed of N.S. were medically necessary, and to perform the studies that were in fact ordered by the referring physician.

414.   None of the MRIs performed on N.S. by Complete Imaging were reasonable or medically necessary.

415.   Complete Imaging submitted claims for payment and accompanying medical records relative to N.S. to Allstate through the U.S. Mail seeking

reimbursement for unreasonable and unnecessary imaging, upon which Allstate relied in adjusting the claims.

416.    Allstate is not required to pay Complete Imaging for the fraudulent, unreasonable, and unnecessary imaging that was rendered to N.S., and is entitled to a return of monies it paid to Complete Imaging for these medically unnecessary scans.

## 2.    Patient R.P. (Claim No. 0319694377)

417.    Patient R.P. was allegedly involved in a motor vehicle accident on March 7, 2014.

418.    The first medical treatment R.P. sought following the alleged accident was on May 21, 2014 with Stefan Glowacki, M.D. ("Glowacki").

419.    Rather than attempt any conservative therapy, Glowacki immediately ordered MRIs of R.P.'s lumbar and cervical spine, both of which were performed at Complete Imaging on May 31, 2014.

420.    Glowacki did not find any significant deficits or any other serious condition on examination to justify disregarding the standards of care for MRI imaging.

421.    On July 12, 2014, Complete Imaging allegedly performed bilateral shoulder MRIs of R.P. that were ordered by Jiab Suleiman, M.D.

422.   The radiology reports prepared by Complete Imaging for these alleged MRIs are word-for-word identical apart from the words "left" and "right."  *See* Exhibits 14 and 15.

423.   Though several weeks had passed since the date of the alleged accident before these shoulder MRIs, there still had not been any attempt at conservative treatment of R.P.'s shoulders.

424.   For the four (4) medically unnecessary MRIs allegedly performed on R.P., Complete Imaging sought reimbursement of $19,400 from Allstate.

425.   Complete Imaging had an obligation to confirm that the MRIs performed of R.P. were medically necessary.

426.   None of the MRIs performed on R.P. by Complete Imaging were reasonable or medically necessary.

427.   Complete Imaging submitted claims for payment and accompanying medical records relative to R.P. to Allstate through the U.S. Mail seeking reimbursement for unreasonable and unnecessary imaging, upon which Allstate relied in adjusting the claims.

428.   Allstate is not required to pay Complete Imaging for the fraudulent, unreasonable, and unnecessary imaging that was rendered to R.P.

### 3.    Patient R.S. (Claim No. 0439499558)

429.    Patient R.S. was allegedly involved in a motor vehicle accident on December 13, 2016.

430.    R.S. was allegedly evaluated by Awaisi on January 10, 2017.

431.    Awaisi did not perform a physical examination of any significance, but nevertheless ordered MRIs of R.S.'s lumbar spine, thoracic spine, cervical spine, and bilateral shoulders.

432.    Awaisi did not articulate any reason for ordering these five (5) MRIs, and they were not noted to be part of any treatment plan or to rule out any potential diagnoses.

433.    All of the MRIs ordered by Awaisi were performed at Complete Imaging on January 13, 2017.

434.    When R.S. returned to Awaisi's practice after the MRIs were performed, the MRIs were not mentioned and her treatment plan was not altered.

435.    For the five (5) medically unnecessary MRIs allegedly performed on R.S., Complete Imaging sought reimbursement of $25,600 from Allstate.

436.    Complete Imaging had an obligation to confirm that the MRIs performed of R.S. were medically necessary.

437.    None of the MRIs performed on R.S. by Complete Imaging were reasonable or medically necessary.

70

438.   Complete Imaging submitted claims for payment and accompanying medical records relative to R.S. to Allstate through the U.S. Mail seeking reimbursement for unreasonable and unnecessary imaging, upon which Allstate relied in adjusting the claims.

439.   Allstate is not required to pay Complete Imaging for the fraudulent, unreasonable, and unnecessary imaging that was rendered to R.S.

### 4.    Patient S.K. (Claim No. 0445439193)

440.   Patient S.K. was allegedly involved in a motor vehicle accident on February 7, 2017.

441.   S.K. was evaluated by Usama Gabr, M.D. ("Gabr") on February 10, 2017, just three (3) days after the alleged accident.

442.   At the time of Gabr's examination, S.K. had not attempted any conservative therapy.

443.   Gabr's neurological examination found normal 5/5 strength, normal reflexes, and normal sensory responses.

444.   Gabr did not report any suspicion of fracture or other serious condition that would justify deviation from the standard of care for ordering and performing MRI imaging.

445.   Gabr nevertheless "[r]ecommended MRI of the cervical spine, lumbar spine later."

71

446.   S.K. presented to Complete Imaging on March 10, 2017, where she underwent MRIs of her lumbar spine, thoracic spine, and cervical spine.

447.   S.K. then returned to Complete Imaging on July 21, 2017 for a repeat MRI of her cervical spine and an MRI of her shoulder.

448.   The physician who ordered the second cervical MRI specifically explained that he was ordering the imaging with contrast to provide further analysis of a syrinx observed on the March 10, 2017 MRI.

449.   Complete Imaging performed the July 21, 2017 cervical MRI without contrast, disregarding the specific reason it was ordered.

450.   For the five (5) medically unnecessary MRIs, several of which were ordered within days and performed within weeks of S.K.'s alleged accident, Complete Imaging sought reimbursement of $24,900 from Allstate.

451.   Complete Imaging had an obligation to confirm that the MRIs performed of S.K. were medically necessary, and to perform the studies that were in fact ordered by the referring physician.

452.   None of the MRIs performed on S.K. by Complete Imaging were reasonable or medically necessary.

453.   Complete Imaging submitted claims for payment and accompanying medical records relative to S.K. to Allstate through the U.S. Mail seeking

reimbursement for unreasonable and unnecessary imaging, upon which Allstate relied in adjusting the claims.

454.   Allstate is not required to pay Complete Imaging for the fraudulent, unreasonable, and unnecessary imaging that was rendered to S.K., and is entitled to a return of monies it paid to Complete Imaging for these medically unnecessary scans.

**B.    UNNECESSARY AND EXCESSIVE URINE DRUG TESTING**

455.   Orchard Toxicology and North West Labs billed Allstate for a litany of urine drug testing that was medically unnecessary, unreasonable, excessive, and was not performed in accordance with established standards of care for urine drug testing.

456.   The unnecessary, unreasonable, and excessive urine drug testing performed and encouraged by the defendants included (1) failure to perform screening testing in the absence of point-of-care screening testing, (2) unnecessary confirmatory testing of expected point-of-care screening results, and (3) unnecessary definitive/quantitative confirmation testing.

457.   Toxicology monitoring is only reasonable and medically necessary when it is performed randomly to assess a patient's compliance with treatment with controlled substances.

458.   Orchard Toxicology and North West Labs routinely performed definitive/quantitative testing for dozens of substances for the same patient on a regular schedule, often within weeks of each other.

459.   Orchard Toxicology and North West Labs also routinely performed definitive/quantitative testing on urine specimens provided by patients who were not prescribed controlled substances at all.

460.   The defendants attempted to conceal the extent of excessive and medically unnecessary urine drug testing performed by withholding from Allstate medical records that would have revealed their failure to adhere to applicable standards of care.

461.   Indeed, the biller for Orchard Toxicology has admitted to Allstate that she was specifically directed by defendant Ahmad not to send medical records to insurance companies when mailing bills.

462.   Even after Allstate requested such medical records upon receipt of bills, Orchard Toxicology rarely produced such documentation.

463.   The documents intentionally withheld by Orchard Toxicology and North West Labs included requisition forms used by referring physicians to order the urine drug testing allegedly performed.

464.   North West Labs has never produced a requisition form to Allstate.

465.   Among the information obscured by Orchard Toxicology's and North West Labs's policy of withholding these records was (1) confirmation that tests allegedly performed were actually ordered by the referring physician; (2) the drugs (if any) that the patient was prescribed; (3) diagnosis codes allegedly supporting the need for testing; and (4) the (non-)existence of point-of-care screening results prior to the ordering of definitive/quantitative testing.

466.   One of the few requisition forms that was provided to Allstate by Orchard Toxicology, relative to patient K.C. (Claim No. 0363169731), illustrates the reason that such records are intentionally concealed by the defendants.  *See* Exhibit 16.

467.   K.C. allegedly provided a urine specimen to Sripada on June 26, 2015.

468.   The requisition form relative to this urine specimen is not signed by any physician.  Id.

469.   The requisition form indicates that no drugs were prescribed to K.C. Id.

470.   The requisition form fails to record the results of a point-of-care screening test.  Id.

471.   The requisition form also does not order specimen validity testing, or identify any specific drugs/analytes to be tested.  Id.

472.   A preprinted statement on the requisition form states "[i]f no boxes are marked, I authorize [Orchard Toxicology] to perform the Custom Profile I have established on file with [Orchard Toxicology]." Id.

473.   This unsigned requisition form for a patient without any prescription medications resulted in testing for forty (40) different drugs/analytes, including at least five (5) that could not have been ordered had the referring provider selected individual substances to be tested.

474.   The urine specimen tested negative for each of the drugs/analytes, which could have been established through the use of a point-of-care test.

475.   Instead, and as further described below, the testing performed on K.C.'s urine specimen exemplifies the defendants' performance of excessive and medically unnecessary urine drug testing as a matter of course for each patient at issue herein.

476.   Another requisition form provided to Allstate relative to patient R.H. (Claim No. 0305563660) reveals that Orchard Toxicology performed excessive testing regardless of the actual physician order. *See* Exhibit 17.

477.   The requisition form for R.H., which is also unsigned by the alleged referring physician, indicated that definitive/quantitative testing was ordered for just one (1) substance on August 27, 2015. Id.

478.   Orchard Toxicology nevertheless allegedly tested R.H.'s urine specimen for over 60 different substances.

479.   The toxicology report relative to R.H. created by Orchard Toxicology also falsely stated that the referring provider had ordered one of Orchard Toxicology's predetermined panels of substances with testing for adulterants. *See* Exhibit 18.

480.   Similarly, a requisition form for patient L.K. (Claim No. 217819704) dated December 18, 2015 did not order any specific testing to be performed, but noted positive point-of-care screening results for opiates and oxycodone only. *See* Exhibit 19.

481.   Orchard Toxicology submitted bills to Allstate relative to the tests allegedly performed on patient L.K.'s December 18, 2015 urine specimen using nineteen (19) different CPT Codes testing for dozens of drugs/analytes that were not ordered by the referring physician.

482.   For the vast majority of the urine drug testing bills at issue in this Complaint, Allstate was unable to determine whether the tests performed by Orchard Toxicology and North West Labs were actually ordered by physicians because of the defendants' intentional concealment of requisition forms.

483.   The few requisition forms that have been produced reveal that Orchard Toxicology, North West Labs, and their owners Ahmad and Elias disregarded physician orders and medical necessity to perform the maximum amount of tests on

every urine specimen they obtained, solely to increase the amount of their charges submitted to Allstate.

### 1.    Testing Procedure Used by Orchard Toxicology and North West Labs

484.   Orchard Toxicology uses a urine drug testing methodology called liquid chromatography mass-spectrometry (LC-MS).

485.   Although it is required to properly submit bills for definitive/quantitative urine drug testing, North West Labs does not report the methodology it uses on its laboratory reports.

486.   Moreover, all laboratory reports submitted by North West Labs to Allstate contain a disclaimer stating "[t]his is a laboratory-developed test, which is not FDA approved."

487.   Thus, it is impossible to determine the methodology North West Labs purportedly used to perform the urine drug testing at issue in this Complaint.

488.   North West Labs's website advertises that it uses a LC-MS/MS methodology, which is similar to the LC-MS methodology used by Orchard Toxicology.

489.   Unsubstantiated website advertisements are not sufficient to establish the use of appropriate laboratory methodologies for bills submitted for purported definitive/quantitative urine drug testing.

490.    Both LC-MS and LC-MS/MS urine drug testing methodologies use a solvent gradient for the liquid chromatography (LC) portion of the procedure.

491.    The urine specimen is dissolved in the first solvent (the initial mobile phase).

492.    The initial mobile phase carries the analytes (i.e., drugs) through the stationary phase where the drugs adhere (stick) to the stationary phase.

493.    The stationary phase continues to flow, but a progressively greater proportion of a second solvent is mixed into the mobile phase until it completely replaces the original solvent.

494.    The increasing gradient of the second solvent causes the analytes (drugs) to progressively detach from the stationary phase and be eluted from the column where they are introduced into the mass spectrometry (MS) or tandem mass spectrometry (MS/MS) portion of the procedure.

495.    The technique of progressively changing the proportion of the two solvents in the mobile phase is known as a "solvent gradient."

496.    For example, morphine may release its attachment from the stationary phase when the ratio of the first solvent and the second solvent reaches 90:10, resulting in only the morphine analyte (drug) appearing at the end of the column while the rest of the analytes (drugs) remain.

497.   As the first and second solvent continue to mix reaching a ratio of 80:20, the amphetamine analyte (drug) may then release its attachment and appear at the end of the column.

498.   The process is continued until the solvent gradient no longer causes analytes (drugs) to detach from the stationary phase and be eluted from the column.

499.   The only costs to Orchard Toxicology and North West Labs for LC-MS and LC-MS/MS urine drug testing (if North West Labs actually used LC-MS/MS, which was never reported on the records submitted to Allstate) are the costs of the equipment, the cost of setting up the stationary phase for each urine specimen, the cost of introducing the specimen into the mobile phase, the cost of automatically pumping the two solvents through the system, and the cost of reporting the results to the referring provider.

500.   Because Orchard Toxicology and North West Labs must perform at least one procedure in order to conduct definitive/quantitative urine drug testing and because Orchard Toxicology and North West Labs only perform one procedure via their LC-MS and purported LC-MS/MS testing, Orchard Toxicology's and North West Labs's costs are not in any way dependent on or correlated to the number of specific drugs that are tested for.

501.   It makes no difference what drug tests the treating provider orders, as the same two solvents and the same analytic procedure is performed on every urine specimen.

502.   All of the costs associated with Orchard Toxicology's and North West Labs's LC-MS and purported LC-MS/MS testing are incurred with the testing of the first drug and there is no additional marginal cost incurred for testing each drug after the first.

503.   In other words, the cost to Orchard Toxicology and North West Labs of performing LC-MS and purported LC-MS/MS urine drug testing is the same whether a referring provider requests the testing of one drug or forty drugs.

504.   As such, Orchard Toxicology and North West Labs push their referring providers to order an unnecessary and excessive number of drugs to be tested per specimen regardless of need since each subsequent drug test ordered after the first drug generates purely additional profits to the defendants.

### 2.   Failure to Perform Screening Testing in the Absence of Point-of-Care Testing

505.   The standard of care for urine drug testing first directs that screening be performed to detect the presence or absence of substances.

506.   Only unexpected screening results should be confirmed (absent circumstances that must be documented in the patient's medical records by the treating provider).

81

507.    This standard is documented by the Substance Abuse and Mental Health Services Administration (SAMHSA), a federal agency within the Department of Health and Human Services that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not always necessary. Clinical correlation is appropriate . . . .  In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test.  However, if the patient disputes the <u>unexpected findings</u>, a confirmatory test should be done." *See* Exhibit 20.

508.    Thus, SAMHSA confirms that, at most, only unexpected initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

509.    Point-of-care testing is used by providers to obtain immediate drug testing results indicating whether a patient's specimen contains the prescribed medication, an illicit substance, and/or a non-prescribed medication.

510.    The providers who sent urine specimens to Orchard Toxicology and North West Labs very rarely, if ever, performed point-of-care testing before ordering excessive, expensive, and unnecessary definitive/quantitative testing from Orchard Toxicology and North West Labs.

511.   If point-of-care testing was not performed by the referring providers, pursuant to the standard of care for clinical laboratories, Orchard Toxicology and North West Labs should have performed their own presumptive/qualitative testing instead of immediately performing definitive/quantitative testing, but they did not.

512.   Neither Orchard Toxicology nor North West Labs has never submitted a charge to Allstate for presumptive/qualitative testing.

513.   This is not surprising as presumptive/qualitative testing is usually reimbursed at a lower rate than definitive/quantitative confirmatory testing per specimen.

514.   At all relevant times, Orchard Toxicology and North West Labs have been, and remain, capable of performing presumptive/qualitative testing.

515.   But instead of performing a presumptive/qualitative test in those instances where a screen had not already been performed at the point-of-care level to determine whether definitive/quantitative testing was warranted, Orchard Toxicology, North West Labs, Ahmad, and Elias instead made the deliberate decision to perform definitive/quantitative testing immediately.

516.   These defendants' decision resulted in hundreds of instances where expensive and complex definitive/quantitative testing was unnecessarily performed that could have been avoided if initial testing to screen out expected results had been performed.

517.   Indeed, as discussed above, the standard of care in the clinical laboratory community is to conduct a presumptive test and then confirm only those drugs/drug categories where the screening result was unexpected or where the treating provider has a patient-specific reason to request confirmation of a presumptive/qualitative test result.

518.   The defendants blatantly disregarded the standard of care in favor of maximizing their profits.

### 3.   Unnecessary Confirmatory Testing of Expected Point-of-Care Screening Results

519.   On the rare occasions where the providers who referred urine specimens to Orchard Toxicology and North West Labs performed point-of-care screening, Orchard Toxicology and North West Labs disregarded the results of such tests and went ahead with expensive and unnecessary confirmatory testing even when the screening results were normal and expected.

520.   Orchard Toxicology's requisition form includes a section for point-of-care screening results to be reported.  *See, e.g.,* Exhibits 16, 17, and 19.

521.   Thus, Orchard Toxicology was aware of instances where point-of-care testing was performed by the referring provider.

522.   Despite the standard of care for clinical laboratories like Orchard Toxicology and North West Labs that expected screening results do not need to be

confirmed, the defendants nonetheless billed Allstate for confirmatory testing of expected screening results.

523.   In clinical urine drug testing, confirmatory testing is not always done and certainly should not be done automatically.

524.   Instead, confirmatory testing is to be ordered at the treating provider's discretion and must be patient-specific, e.g., when an initial screening test result is clinically unexpected for the particular patient at issue (such as when a doctor-prescribed drug is reported as negative or when a non-prescribed or illicit drug is reported as positive).

525.   Absent extenuating circumstances (as found and documented by the treating provider), confirmatory testing by any methodology is not necessary where the screening test indicates that a drug is not present in the patient's urine (i.e., the test is negative).

526.   In rare instances dependent on the individual patient's clinical situation, confirmatory drug testing may be medically necessary when the results of the screening test are presumptively positive or when the results of the screening test are negative and the negative finding is inconsistent with the patient's medical history.

527. However, for confirmatory testing on a negative presumptive/qualitative test to be appropriate, the referring provider, and not the

testing laboratory, must determine if confirmatory testing is necessary after taking into consideration all known facts at the time the specimen is collected.

528.    No provider can make a blanket predetermination across all patients and all dates of service as to what constitutes reasonable confirmatory urine drug testing in all cases.

529.    Instead, the individual provider must determine the reasonableness and necessity of urine drug testing on a patient-by-patient and visit-by-visit basis.

530.    Orchard Toxicology and North West Labs used excessive and unjustifiable confirmatory testing to confirm the absence of a drug that was clearly reported as "negative," or not present, in point-of-care screens performed by the treating provider.

531.    The level of confirmation Orchard Toxicology and North West Labs performed on the specimens of patients undergoing pain management treatment after involvement in predominately low-level motor vehicle accidents significantly exceeded the level of confirmation required by the Nuclear Regulatory Commission's policy on drug testing confirmation.

532.    Persons authorized to operate a nuclear power reactor under the scope of the Nuclear Regulatory Commission ("NRC") are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

533.   The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3).

534.   The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory testing."  10 C.F.R. § 26.5.

535.   Thus, the NRC does not require that confirmatory testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

536.   In comparison, Orchard Toxicology and North West Labs always billed Allstate for unnecessary confirmatory testing even where screening results were negative for patients purportedly involved in low-level motor vehicle accidents and none of whom are known to maintain and/or operate nuclear power reactors.

537.   Orchard Toxicology and North West Labs engaged in a fraudulent scheme designed to obtain payment for excessive and unnecessary confirmatory urine drug testing of expected screening test results.

538.   This scheme is objectively fraudulent as it disregards established standards of care for when confirmatory testing is necessary.

### 4.   Unnecessary Definitive/Quantitative Testing

539.   As detailed above, the defendants had the singular goal of generating as many claims as possible against payors like Allstate.

540.   The defendants were aided in attaining their goal by the standard procedures and forms that they established that were used by all treating providers who referred specimens to Orchard Toxicology and North West Labs for urine drug testing, including custom profiles, panel testing, and requisition forms.

541.   Orchard Toxicology offered referring physicians the choice of four "panels" of tests to be performed.

542.   The most common slate of tests performed by Orchard Toxicology was their "Complete PMP" panel, which tested for 72 different drugs/analytes.

543.   Use of the Complete PMP panel, along with all other panels used by Orchard Toxicology, meant that the same drugs/analytes would be tested by Orchard Toxicology for every specimen/patient.

544.   Each of the urine specimens purportedly tested by North West Labs was subjected to the same "Drug Adherence Assessment," which included testing for 62 to 67 different drugs/analytes.

545.   Use of panels is necessarily not patient-specific as the drugs/analytes to be tested are established prior to the patient's urine drug testing referral.

546.   Orchard Toxicology's and North West Labs's use of panel testing violates established standards of practice that demand that only medically necessary urine drug testing be performed, as decided on a patient-by-patient and visit-by-visit basis by a licensed healthcare professional.

547.   The Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has formulated a compliance program providing clear guidance to clinical laboratories to reduce fraud and abuse within their organizations and "assist clinical laboratories in developing effective internal controls that promote adherence to applicable Federal and State law, and the program requirements of Federal, State, and private health plans."  *See* Exhibit 21 at 45077.

548.   With respect to testing panels, the OIG has stated that "standing orders . . . too often . . . have led to abusive practices."  Id. at 45081.

549.   Specifically, the OIG has stated that "[l]aboratories routinely offer customized profiles and panels to physicians.  Physicians often order the profile/panel containing the test they need rather than specifying just the needed test(s).  Profiles and panels desensitize physician concerns about the medical necessity of the laboratory tests they are ordering.  Moreover, panels and profiles contribute to unbundling billing schemes and contribute to the ordering of medically unnecessary laboratory tests."  *See* Exhibit 22.

550.   By way of example, phencyclidine (PCP) was routinely tested (and billed to Allstate) by Orchard Toxicology and North West Labs without the referring provider indicating the medical necessity of testing for such an illicit substance.

551.   With respect to requisition forms, the OIG has stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill." *See* Exhibit 21 at 45079.

552.   As discussed above, instead of abiding by the OIG (and other) guidelines, Orchard Toxicology's requisition form and North West Labs's use of the same panel testing for each patient instead is designed to increase the number of tests performed and ignores considerations about medical necessity.

553.   This is evidenced by Orchard Toxicology's default to the referring provider's custom profile (which necessarily cannot be patient-specific as it was decided before the patient was known to the referring provider), by Orchard Toxicology's requisition form's failure to allow the referring provider to subtract any tests from the panel preference (though the provider is given the option to add tests), and by North West Labs's use of the same panel assessment for each specimen.

554.   In fact, many of the drugs/analytes included in Orchard Toxicology's Complete PMP panel could not be ordered individually by a referring provider using Orchard Toxicology's requisition form.

555.   Among the drugs/analytes automatically tested (and billed to Allstate) pursuant to Orchard Toxicology's Complete PMP panel was acetaminophen, which is a common over-the-counter pain reliever for which there is no rationale to test as a matter of course.

556.   Both Orchard Toxicology and North West Labs routinely billed for alleged testing of dozens of drugs/analytes that are not commonly abused and are not contraindicated by the pain management treatments prescribed to the patients at issue herein.

557.   "Laboratory compliance programs, to be effective, should communicate to physicians that claims submitted for services will only be paid if the service is covered, reasonable, and necessary for the beneficiary, given his or her clinical condition.  Laboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable, and necessary for the beneficiary, given his or her clinical condition."  *See* Exhibit 21 at 45079.

558.   Instead of taking steps to ensure that they were submitting claims for necessary urine drug testing, Orchard Toxicology and North West Labs (by and through their owners and managers, including Ahmad and Elias) intentionally

91

worked to increase the number of medically unnecessary tests referred by physicians and billed to payors like Allstate.

559. The OIG has also stated that "when claims for medically unnecessary services are discovered, Medicare holds the billing laboratory financially responsible for any incorrect payments." *See* Exhibit 22 at p. 18 (emphasis added).

560. The defendants submitted claims for medically unnecessary urine drug testing; thus, Orchard Toxicology and North West Labs are financially responsible for all payments made by Allstate.

561. For all of these reasons, the requisition forms and predetermined panels developed and used by Orchard Toxicology, North West Labs, Ahmad, and Elias facilitated and encouraged excessive and unnecessary urine drug testing.

562. Allstate is not required to reimburse Orchard Toxicology and North West Labs for urine drug testing that is not patient-specific and that is unnecessary.

563. Allstate is entitled to a return of monies it paid to Orchard Toxicology for these medically unnecessary urine drug tests.

### 5. Exemplar Claims

564. The following are representative examples of the defendants' practice of billing Allstate for excessive and medically unnecessary urine drug testing.

## 1.    Patient L.G. (Claim No. 0438133043)

565.   Patient L.G. was allegedly involved in a motor vehicle accident on May 28, 2016.

566.   L.G. came under the care of convicted felon Trotter, who allegedly ordered urine drug testing to be performed by Orchard Toxicology on January 5, 2017, May 2, 2017, May 24, 2017, and June 20, 2017.

567.   Orchard Toxicology did not provide Allstate with requisition forms for any of these alleged dates of service.

568.   Each toxicology report produced by Orchard Toxicology notes that it performed a "Complete PMP" panel with specimen validity testing, and each lists the results for approximately 70 drugs/analytes allegedly tested.

569.   Trotter was convicted on three (3) counts of healthcare fraud and one (1) count of conspiracy to commit healthcare fraud on April 28, 2017, before three (3) of the dates he allegedly ordered urine drug testing for L.G.

570.   The records of Trotter's former practice indicate that L.G. was actually seen by Bhatti on the dates of service after Trotter's conviction.

571.   However, Bhatti's records make no reference to the need for nor the ordering of urine drug testing, and Orchard Toxicology makes no reference to Bhatti ordering the testing allegedly performed.

572.   Orchard Toxicology did not note the existence of any inconsistent or unexpected test results on May 2, 2017, but nevertheless performed medically unnecessary repeat testing just twenty-two (22) days later on May 24, 2017.

573.   Bhatti never made any reference to the test results or the need for additional testing, so there was no justification in the medical record for Orchard Toxicology to perform a second test after just three (3) weeks.

574.   Additional unnecessary definitive/quantitative tests of urine specimens provided by L.G. were allegedly conducted by Orchard Toxicology on July 18, 2017, August 8, 2017, September 19, 2017, and October 24, 2017.

575.   North West Labs allegedly performed definitive/quantitative testing on urine specimens provided by L.G. on December 12, 2017 and January 9, 2018.

576.   There is no record establishing the medical need for any of the tests allegedly performed relative to L.G., nor the medical need for the scores of drugs/analytes tested on each occasion.

577.   The medications prescribed to L.G. changed over the period of time Orchard Toxicology and North West Labs allegedly performed testing, evidencing that the "Complete PMP" panel used for each test was not individually tailored for her medical needs at the time each test was performed.

578.   None of L.G.'s treating physicians performed a screening test on L.G.'s urine specimen.

94

579.    Orchard Toxicology and North West Labs failed to perform a presumptive/qualitative screen on L.G.'s urine specimens and instead moved directly to the more expensive definitive/quantitative testing.

580.    Trotter also ordered MRIs of L.G.'s entire spine, which were performed at Complete Imaging on August 28, 2016.

581.    None of Trotter's office records predating these MRIs discuss the medical need for MRI imaging.

582.    A fourth MRI, of L.G.'s right hip, was ordered by Trotter and performed at Complete Imaging on March 25, 2017.

583.    Orchard Toxicology and North West Labs billed Allstate $22,661.45 for the medically unnecessary urine drug testing relative to L.G.

584.    Orchard Toxicology, North West Labs, and Complete Imaging submitted claims for payment and accompanying medical records relative to L.G. to Allstate through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

## 2.    Patient C.S. (Claim No. 0439225269)

585.    Patient C.S. was allegedly involved in a motor vehicle accident on December 13, 2016.

586.    C.S. began treatment with Bhatti on April 6, 2017, and urine drug testing was allegedly ordered on that date.

95

587.   Bhatti did not note any need for definitive/quantitative testing, did not perform a point-of-care screening test, and did not prescribe any medications.

588.   The toxicology report produced by Orchard Toxicology for the urine specimen collected on April 6, 2017 indicates that a Complete PMP panel with specimen validity testing was ordered by Bhatti, resulting in testing for approximately 70 different substances.

589.   Orchard Toxicology withheld the requisition form allegedly signed by Bhatti, thus preventing Allstate from confirming that any of the tests allegedly performed by Orchard Toxicology were actually ordered by the referring physician.

590.   The toxicology report for the April 6, 2017 urine specimen does not record any inconsistent or unexpected results.

591.   Orchard Toxicology nevertheless repeated the exact same definitive/quantitative tests on specimens allegedly collected on April 26, 2017 and May 4, 2017.

592.   There is no indication that Bhatti nor any physician or assistant at his practice actually collected a urine specimen from C.S. on April 26, 2017, as there have been no records or bills submitted to Allstate for that alleged date of service.

593.   Orchard Toxicology did not submit requisition forms to Allstate for either the April 26, 2017 or May 4, 2017 specimens, depriving Allstate of the ability to confirm that the tests allegedly performed were actually ordered by a physician.

96

594.   Allstate made at least two (2) separate requests to Orchard Toxicology for the requisition forms purportedly ordering these tests, but Orchard Toxicology never produced them.

595.   Bhatti never made any reference to the test results or the need for additional testing, so there was no justification in the medical record for Orchard Toxicology to perform three (3) definitive/quantitative tests in a period of less than one (1) month.

596.   Screening was never performed on C.S.'s urine specimens, but Orchard Toxicology nevertheless moved directly to the more expensive definitive/quantitative testing.

597.   Bhatti also ordered bilateral shoulder MRIs which were performed on April 23, 2017 at Complete Imaging, despite no attempts at conservative treatment to C.S.'s shoulders, nor any articulated concern for fracture or other underlying condition justifying disregard of ACR guidelines.

598.   Orchard Toxicology billed Allstate $5,410.32 for the medically unnecessary urine drug testing relative to C.S.

599.   Orchard Toxicology and Complete Imaging submitted claims for payment and accompanying medical records relative to C.S. to Allstate through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

600.   Allstate is not required to pay Orchard Toxicology and Complete Imaging for medically unnecessary testing and imaging allegedly rendered to C.S., and is entitled to a return of the money paid to Complete Imaging in reliance on the defendants' fraud.

### 3.   Patient D.F. (Claim No. 0449222371)

601.   Patient D.F. was allegedly involved in a motor vehicle accident on June 22, 2016.

602.   D.F. presented for treatment at a pain management clinic, where he was seen on three (3) occasions during the year following the alleged motor vehicle accident.

603.   None of the records from the pain management clinic that purportedly treated D.F. mention any issues of drug abuse or misuse.

604.   On July 31, 2017, Orchard Toxicology performed definitive/quantitative testing on a urine specimen that was allegedly collected at the pain management clinic on that date.

605.   If the prescribing physician properly signed a requisition form for this testing, Orchard Toxicology withheld the same from Allstate, thus preventing Allstate from confirming that any of the tests allegedly performed by Orchard Toxicology were actually ordered by the referring physician.

606. The toxicology report produced by Orchard Toxicology notes that it performed a "Complete PMP" panel with no THC, and listed the results for approximately 70 substances allegedly tested.

607. There is no record establishing the medical need for this excessive number of substances to be tested.

608. Orchard Toxicology reported that D.F. tested negative for the prescribed medication oxycodone and its metabolites, but did not report numeric values for the concentration levels found.

609. Although Orchard Toxicology submitted bills to Allstate for specimen validity testing using five (5) different CPT Codes, the toxicology report does not include any results for such testing.

610. The predetermined test panel used by Orchard Toxicology resulted in the performance of excessive and medically unnecessary testing.

611. Orchard Toxicology failed to perform a screening test of D.F.'s urine specimen, instead moving directly to the more expensive definitive/quantitative testing.

612. Orchard Toxicology submitted charges totaling $1,710.39 for this medically unnecessary urine drug testing.

613. Orchard Toxicology submitted claims for payment and accompanying medical records relative to D.F. to Allstate through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

### 4. Patient R.A. (Claim No. 0328358643)

614. Patient R.A. was allegedly involved in a motor vehicle accident on May 29, 2014.

615. R.A. came under the care of Sripada, who first ordered definitive/quantitative testing from Orchard Toxicology on May 15, 2015.

616. Sripada did not note any concern for abuse or diversion of medications, nor any medical need for definitive/quantitative urine testing.

617. Sripada did not perform a point-of-care screen of R.A.'s urine specimen.

618. Orchard Toxicology withheld the requisition form for the May 15, 2015 urine specimen, if one was actually signed by Sripada, depriving Allstate of the ability to confirm what tests, if any, were actually ordered.

619. Orchard Toxicology performed a "Complete PMP" panel with adulterant testing, resulting in tests for 73 different substances.

620. The only result that Orchard Toxicology reported as "unexpected" was acetaminophen, an over-the-counter pain reliever.

621.   Sripada's partner, Marc Orlewicz, M.D. ("Orlewicz"), evaluated R.A. on February 16, 2016, the date of the next urine specimen allegedly tested by Orchard Toxicology.

622.   Orchard Toxicology again withheld the requisition form, if one exists.

623.   Orlewicz did not prescribe or refill any medications for R.A., but Orchard Toxicology nevertheless performed the same "Complete PMP" panel testing for scores of irrelevant substances.

624.   The February 16, 2016 urine specimen tested negative for all substances tested.

625.   Additional definitive/quantitative tests were allegedly performed by Orchard Toxicology on urine specimens collected on June 28, 2016 and April 6, 2017.

626.   Orchard Toxicology withheld requisition forms for both of these tests, if such forms exist.

627.   Both the June 28, 2016 and April 6, 2017 specimens were subjected to the "Complete PMP" panel with specimen validity testing.

628.   Neither the June 28, 2016 nor the April 6, 2017 test yielded any inconsistent results.

629.   Presumptive/qualitative screening tests were never conducted on any of the four (4) urine specimens by either the referring provider or Orchard Toxicology.

630.   Presumptive/qualitative screening tests were never conducted on any of the four (4) urine specimens by either the referring provider or Orchard Toxicology.

631.   Orchard Toxicology submitted claims for payment and accompanying medical records relative to R.A. to Allstate through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

632.   Allstate is not required to pay Orchard Toxicology for medically unnecessary testing allegedly rendered to R.A.

**5.    Patient R.L. (Claim No. 0366554079)**

633.   Patient R.L. was allegedly involved in a motor vehicle accident on April 23, 2015.

634.   R.L. eventually came under the care of a neurologist who purportedly rendered treatment that primarily focused on R.L.'s complaints of headaches and cognitive impairment.

635.   The neurologist did not report any need for urine drug testing or any concerns of drug abuse or misuse.

636.   R.L. was prescribed only Adderall and Myobloc, neither of which are narcotic medications.

637.   R.L.'s physician did not perform any point-of-care testing of R.L.'s urine specimen.

638.   Nevertheless, North West Labs allegedly performed "Drug Adherence Assessment" on a urine specimen collected on October 17, 2017 that resulted in testing for the same 62 different drugs/analytes that it routinely tested for patients who were prescribed opioid painkillers.

639.   North West Labs did not produce a requisition form signed by the neurologist, and its laboratory report incorrectly states that R.L. was not prescribed any medications.

640.   The urine specimen purportedly tested by North West Labs was negative for all substances, including amphetamines, which was an inconsistent result in light of R.L.'s Adderall prescription.

641.   North West Labs incorrectly reported that R.L.'s urine specimen produced consistent results for all substances.

642.   Presumptive/qualitative screening tests were never conducted on the urine specimen by either the referring provider or North West Labs.

643.   North West Labs submitted claims for payment and accompanying medical records relative to R.L. to Allstate through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

644.   Allstate is not required to pay North West Labs for medically unnecessary testing allegedly rendered to R.L.

C.    **MEDICALLY UNNECESSARY PHYSICAL THERAPY**

645.    The relationships Ahmad and Elias developed with unscrupulous referring physicians, as discussed *supra*, played an indispensable role in the defendants' performance of excessive physical therapy as, under Michigan law for dates of service before January 1, 2015, physical therapy had to be prescribed by an individual licensed to practice dentistry, medicine, osteopathic medicine and surgery, or podiatric medicine and surgery.  Mich. Comp. Laws § 333.17820(1) (amended 2014).

646.    After January 1, 2015, physical therapy treatment that exceeds twenty-one (21) days or ten (10) sessions, both of which are shorter than the predetermined protocol used by Total Health, require a prescription from a physician.  Mich. Comp. Laws § 333.17820(1)(a).

647.    Physical therapy must be objectively indicated for each individual patient.

648.    That is, a patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy.

649.    Patients were routinely referred to Total Health without any objective orthopedic or other examination findings justifying the treatment.

650.    The lack of objective findings by referring physicians means that immediate resort to physical therapy was not related to the care, recovery, or

rehabilitation of the patient, thus rendering such physical therapy medically unnecessary and not compensable under Michigan's No-Fault Act.

651.   In approximately 90% of all motor vehicle accident cases, mild injuries will resolve by themselves within a few weeks without any treatment whatsoever.

652.   The purported evaluations and findings made by therapists at Total Health were always strikingly similar, indicating that the exams were *pro forma* and used only to justify unnecessary treatment, instead of to identify each patient's unique symptomology and clinical needs.

### 1.      **Total Health Used a Predetermined Treatment Protocol**

653.   The insignificance of the evaluations allegedly performed by therapists at Total Health is further confirmed by the fact that nearly every patient was prescribed the same course of treatment, regardless of the nature of their alleged injuries, their age, or their medical histories.

654.   Every patient at issue in this Complaint who was allegedly provided physical therapy by Total Health was directed at the outset of treatment to report for therapy at least two (2) to three (3) times per week, for at least four (4) to six (6) weeks.

655.   Nearly every patient at issue in this Complaint was prescribed the same excessive treatment modalities, including (1) hot and cold packs; (2) ultrasound; (3) electric stimulation; (4) therapeutic exercises; (5) manual therapy; and (6) massage.

656.    The actual bills submitted to Allstate by Total Health document adherence to these excessive predetermined treatment plans, with nearly every date of service including billing for four (4) to five (5) separate modalities.

657.    Alleged treatment at Total Health often continued far beyond the four (4) weeks noted in the patient's plan of care, but treatment plans rarely, if ever, changed to attempt to address the patient's alleged failure to improve.

658.    In fact, patients who treated at Total Health rarely reached a conclusion of treatment, with less than twenty-five (25%) of the patients at issue in this Complaint actually discharged from care.

659.    Total Health attempted to justify its excessive treatment by assigning a "functional loss" percentage to each patient at the outset of treatment.

660.    Total Health did not utilize a consistent methodology for the assignment of functional loss, but nearly every patient was assigned a loss of greater than fifty percent (50%).

661.    Several patients who were allegedly evaluated and treated shortly after the formation of Total Health were given an Oswestry disability index ("Oswestry") score, rather than the vague functional loss percentage assigned to later patients.

662.    Oswestry scores are based on a specific questionnaire regarding quality of life.

663.    Oswestry scores between 41 and 60 indicate "severe disability."

664.   Oswestry scores between 61 and 80 indicate "crippling pain."

665.   Oswestry scores between 81 and 100 indicate the patient is either bed-bound or exaggerating their symptoms.

666.   Total Health replaced its use of Oswestry scores with "functional loss" percentages that use the same 0-100 scale.

667.   Total Health's assignment of extraordinarily high functional loss percentages are intended to represent that patients have very significant injuries requiring extensive and lengthy rehabilitation.

668.   In reality, the vast majority of patients who were allegedly treated by Total Health were involved in low impact accidents and sustained very minor injuries, if injury was sustained at all.

669.   The full extent and pattern of Total Health's misrepresentations regarding the lawfulness and necessity of the treatment it allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the filing of this Complaint, including identification of Total Health's pattern of predetermined overtreatment.

670.   The unnecessary treatment rendered by Total Health includes the treatment and patients set out in the chart annexed hereto at Exhibit 4.

671.   Total Health submitted claims for payment and associated medical records to Allstate through the U.S. Mail seeking payment for each patient identified in Exhibit 4.

672.   Allstate is not required to compensate Total Health for treatment that was rendered based on a predetermined treatment protocol that was not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

## 2.   Treatment Without a Valid Prescription

673.   As noted above, all physical therapy performed before January 1, 2015 required a valid prescription from a licensed physician, and physical therapy performed on or after January 1, 2015 required a valid prescription after twenty-one (21) days or ten (10) visits.  Mich. Comp. Laws § 333.17820(1)(a).

674.   The defendants routinely ignored both the requirement to obtain a valid prescription from a licensed physician before initiating treatment and to stop treatment at the point directed by the referring physician, in order to continue to amass charges to submit to Allstate for payment.

675.   The following patients exemplify the defendants' regular disregard for performing only treatment prescribed by a licensed physician:

- Patient R.L. (Claim No. 0322622945) began a course of physical therapy at Total Health on April 17, 2014, allegedly on the direction of Manish Kesliker, M.D. ("Kesliker").  However, Kesliker did not issue a physical therapy referral to R.L. until April 21, 2014.  Total Health

noted that this prescription was valid until May 21, 2014. Total Health nevertheless continued to allegedly treat R.L. on May 22, 27, 28, and 29, 2014, before Kesliker re-issued a physical therapy referral to R.L. Similarly, a subsequent prescription from Kesliker expired on August 22, 2014, but Total Health continued to allegedly render treatment on August 25 and August 28, 2014.

- Patient M.N. (Claim No. 0363464710) was prescribed a six-week course of physical therapy by Sripada on April 30, 2015, which was subsequently renewed on June 11, 2015 and July 10, 2015. The last prescription issued by Sripada expired on August 21, 2015. Total Health nevertheless continued to allegedly treat M.N. for at least eight (8) additional dates of service following the expiration of the physical therapy prescription.

- Patient R.Q. (Claim No. 0363776899) was prescribed a four-week course of physical therapy by Nazih Iskander, M.D. ("Iskander") on April 15, 2015, which was renewed on May 14, 2015. R.Q.'s prescription for physical therapy expired on June 14, 2015. Iskander did not renew the prescription again until August 13, 2015. Between June 14, 2015 and August 13, 2015, R.Q. underwent treatment on at least eight (8) dates of service that were not properly ordered by a licensed physician. R.Q.'s physical therapy prescription lapsed again on October 14, 2015, but he was allegedly treated at Total Health again on October 21 and 28, 2015.

676. Allstate is not required to compensate Total Health for treatment that was rendered without a valid prescription in violation of the Michigan Public Health Code, and it is entitled to the return of money paid in reliance on the defendants' fraud.

## IX.   **FRAUDULENT BILLING PRACTICES**

677. Providers like Complete Imaging, Orchard Toxicology, North West Labs, and Total Health have a responsibility to select and submit the billing code

that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

678.  Complete Imaging, Orchard Toxicology, North West Labs, and Total Health failed to meet this responsibility and instead submitted demands for unreasonable payments to Allstate for medically unnecessary and excessive services, as discussed *supra*, and used fraudulent billing practices.

679.  The defendants submitted reimbursement claims to Allstate through the U.S. Mail on Health Insurance Claim Forms ("HICF") (also known as "CMS-1500" claim forms) approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

680.  The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

681.  The defendants submitted reimbursement claims to Allstate containing CPT Codes seeking payment for MRI imaging, urine drug testing, and physical therapy purportedly performed.

682.  According to the Health Insurance Portability and Accountability Act ("HIPAA"), all healthcare providers are mandated to bill insurance carriers,

including auto insurance carriers like Allstate, utilizing the HIPAA-defined standard transaction code sets (which, in the context of this Complaint, are the CPT Codes).

683. Each provider has the responsibility to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

## A.    IMPROPER BILLING FOR URINE DRUG TESTING

684. The CPT Code Book details the correct CPT Codes for definitive/quantitative urine drug tests.

685. CPT Codes for definitive/quantitative testing are usually specific to the drug being measured in a specimen.

686. The onus is on the laboratory to select the appropriate billing code based on the drug tested for or the type of urine drug test performed (i.e., presumptive/qualitative, semi-quantitative, or definitive/quantitative).

687. As discussed above, all bills submitted by North West Labs for definitive/quantitative urine drug testing, which account for nearly all of the bills submitted by North West Labs, are improper due to its failure to identify the testing methodology purportedly used.

### 1.    Billing for Specimen Validity Testing

688.    As discussed above, Orchard Toxicology and North West Labs routinely billed for specimen validity testing on urine specimens even when such testing was not ordered by the referring physician.

689.    As an initial matter, specimen validity testing is an internal control process that is not separately reportable unless it is specifically ordered by a physician for the management of a patient's specific medical problem.

690.    Orchard Toxicology billed for specimen validity testing using CPT Codes 81002 (*"urinalysis by dipstick PH, specific gravity; non-automated, without microscopy"*); 81003 (*"urinalysis by dipstick PH, specific gravity; automated, without microscopy"*); 82570 (*"creatinine"*); 83986 (*"pH"*); and 84311 (*"spectrophotometry"*).

691.    North West Labs billed for specimen validity testing using CPT Codes 81003 (*"urinalysis by dipstick PH, specific gravity; automated, without microscopy"*); 82570 (*"creatinine"*); and 83986 (*"pH"*).

692.    Beginning in or about January 2016, Orchard Toxicology began inexplicably billing Allstate for both CPT Codes 81002 and 81003 each time a urine specimen was tested for validity, despite both codes describing the same test.

693.   The only difference is that one code (81002) describes obtaining the results by comparing the dipstick to a color-coded key, while the other (81003) obtains results by inserting the dipstick into a machine to obtain the results.

694.   There is never a valid reason to submit charges for both CPT Codes 81002 and 81003 for the same test.

695.   CPT Codes 82570, 83986, and 84311 were deleted from the CPT Code book for 2017, but Orchard Toxicology and North West Labs continue to submit bills for reimbursement using these deleted codes.

696.   Even when these codes were valid, they were not appropriate for specimen testing validity.

697.   CPT Codes 81002 and 81003 are all-encompassing codes that include tests for specific items such as pH.

698.   Orchard Toxicology's and North West Labs's separate charges for pH testing are improper and redundant of the pH testing included in CPT Codes 81002 and 81003.

699.   CPT Codes 83986 and 84311 were both meant to be used for testing bodily fluids other than urine.

700.   It was never proper for Orchard Toxicology and North West Labs to submit charges for urine drug testing using CPT Codes 83986 and 84311.

701.    Thus, Orchard Toxicology's and North West Labs's use of these CPT Codes was intended only to improperly inflate the charges they submitted to Allstate for services that were already covered by other CPT Codes billed.

### 2.    Billing for Chemistry Codes

702.    From April 15, 2015 to February 2, 2016, Orchard Toxicology submitted charges using CPT Code 82542 for nearly every test allegedly performed.

703.    At the time it was used by Orchard Toxicology, CPT Code 82542 was defined as "column chromatography/mass spectrometry (e.g. GC/MS, or HPLC/MS), non-drug analyte not elsewhere specified; quantitative, single stationary and mobile phase."

704.    CPT Code 82542 is an unspecified analyte code that can only be billed when a code for quantitative testing for the specific drug tested is not listed in the CPT Code Book.

705.    Chemistry codes, such as CPT Code 82542, which are not specifically requested by an ordering physician and are derived from the results of other ordered or performed tests are considered part of the ordered procedure and are not separately billable.

706.    Orchard Toxicology nevertheless routinely billed Allstate using chemistry codes for services that should have been included in the numerous charges submitted for the dozens of drugs/analytes tested.

### 3.    Orchard Toxicology Charged Allstate More Than Other Payors

707.    Michigan law is clear that a provider's charge "shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance."  Mich. Comp. Laws § 500.3157.

708.    "[A] no-fault insurer is not liable for the amount of any charge that exceeds the health-care provider's customary charge for a like product, service, or accommodation in a case not involving insurance."  Hofmann v. Auto Club Ins. Ass'n, 211 Mich. App. 55, 103 (1995).

709.    Nevertheless, at a clinic inspection conducted by Allstate, the biller for Orchard Toxicology admitted that she uses different codes to submit bills to Medicare than she uses for auto insurers.

710.    Orchard Toxicology's biller further stated that patients who are not covered by insurance are billed using a "sliding scale" rather than the same amounts charged to auto insurers.

711.    All bills submitted by Orchard Toxicology to Allstate at amounts that differ from the charges submitted to other payors for the same services are unlawful and not compensable pursuant to the No-Fault Act.

## X.    COMPLETE IMAGING'S CHARGES ARE UNREASONABLE AND NOT CUSTOMARY

### A.    COMPLETE IMAGING'S REPRESENTATIONS REGARDING COST AND REVENUE

712.    On or about May 10, 2013, Complete Imaging submitted documents to the Michigan Department of Community Health in support of its application for a Certificate of Need ("CON") to permit it to acquire an MRI host site from Basha Diagnostics, P.C., which was on MRI mobile route 117.

713.    One of the documents submitted in furtherance of Complete Imaging's application was a "Financial Components for Nonsubstantive Review."  *See* Exhibit 23.

714.    In this document, Complete Imaging states that it paid $175,000 to acquire the MRI host site.  Id.

715.    Complete Imaging also represented that its cost to lease the physical space to host the MRI site would be $3,666.67 per month.  Id.

716.    An agreement between Complete Imaging and Imaging Professionals was attached to the CON application, and documented that Complete Imaging would pay $2,900 per day to lease MRI equipment.  The lease terms include the provision of qualified and trained support personnel to operate the equipment. *See* Exhibit 24.

717.   Complete Imaging also submitted a revenue projection in which it estimated that its total revenue in its first year of operation would be $784,535. *See* Exhibit 25.

718.   Complete Imaging also represented that its total operating expenses would be $383,700 per year, a figure which included "salaries and wages," "payroll taxes and benefits," "equipment lease," "insurance," "medical supplies," "office supplies," "rent," "professional services," "internet, telephone, and utilities," and "other." Id.

719.   In other words, the factors Complete Imaging considered in arriving at its projected operating costs were comprehensive, further supporting the accuracy of its projections.

### B.    COMPLETE IMAGING'S CHARGES TO ALLSTATE

720.  From November 16, 2013 through present, Complete Imaging submitted the following charges to Allstate for its alleged MRI services:

| MRI CPT Code Billed | CPT Code Description | Amount Billed Per MRI |
|---|---|---|
| 70551 | Brain MRI, without contrast | $5,900.00 |
| 72141 | Cervical MRI, without contrast | $5,200.00 |
| 72146 | Thoracic MRI, without contrast | $5,200.00 |
| 72148 | Lumbar MRI, without contrast | $5,200.00 |
| 72195 | SI Joint MRI, without contrast | $4,500.00 |
| 73218 | Upper extremity MRI, without contrast | $4,500.00 |
| 73221 | Upper extremity joint MRI, without contrast | $4,500.00 |
| 73718 | Lower extremity MRI, without contrast | $4,500.00 |
| 73721 | Lower extremity joint MRI, without contrast | $4,500.00 |

*See* Exhibit 1.

721.   Thus, Complete Imaging billed Allstate a minimum of $4,500 and as much as $5,900 for each MRI it performed since November 16, 2013.

722.   As itemized in the chart annexed hereto at Exhibit 1, Complete Imaging billed Allstate for 340 MRIs since November 16, 2013.

723.   Complete Imaging billed Allstate in the amount of $1,697,300 for the 340 MRIs allegedly performed since November 16, 2013.  Id.

724.   This averages to more than $400,000 in annual charges submitted by Complete Imaging to Allstate.

725.   This annual amount billed just to Allstate exceeds Complete Imaging's total annual operating expenses by more than $15,000.

118

726.   In other words, Complete Imaging submitted enough charges just to Allstate to cover its entire expenses and make a profit from just one insurer.

727.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

728.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

729.   The defendants' charges are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

## C.   COMPLETE IMAGING'S RADIOLOGIST CONFIRMS THAT ITS CHARGES ARE UNREASONABLE

730.   Michael Paley, M.D. ("Paley") has read and authored reports interpreting MRI scans for patients at issue in this Complaint on behalf of Complete Imaging.

731.   Paley testified that he is a licensed medical doctor in Ohio, Pennsylvania, New York, Indiana, Illinois, Michigan, and Florida.

732.   Paley testified that he interprets (reads) MRIs on behalf of clinics located in Ohio, Pennsylvania, New York, Florida, Michigan, and Illinois.

733.   Paley testified that his typical charge for interpreting is between $40 and $80 per MRI.

734.    At all times relevant to this Complaint, Paley owned and operated Network Imaging Associates, an outpatient imaging center in Ohio that provides MRIs.

735.    Paley testified that his "typical charge is about $1,200" for an MRI at his Ohio clinic and that his cost per MRI is less than $1,200.

736.    When asked what factors "affect the cost of [an] MRI," Paley identified almost the exact same operating expenses as the defendants accounted for in Exhibit 25, including "[t]he cost of equipment," "monthly payment on the rent," "insurance," "electricity," "salaries," "the cost of the read and the cost of the contrast and the IVs and the tape," and "[m]arketing."

737.    Paley, with whom Complete Imaging contracted to read several of the MRI scans at issue in this Complaint, testified that he considers $5,000 to be a "high number" for a MRI charge.

738.    Paley also testified that a charge of $5,220 for the technical component of an MRI (i.e., that portion of an MRI that involves taking the images, as opposed to interpreting the images) "would be unreasonable" for his clinic.

739.    Paley further testified that based on his experience, including operating his own outpatient MRI clinic, the cost of performing an MRI is between $420 and $470.

740.    Thus, Complete Imaging's chosen radiologist has stated under oath that the cost of an MRI is less than $500 and that a charge for an MRI of more than $5,000 is unreasonable, thereby confirming that Complete Imaging's MRI charges are excessive and unreasonable.

### D.    COMPLETE IMAGING'S CHARGES FAR EXCEED THE AMOUNTS PAID BY OTHER MICHIGAN PAYORS

741.    In addition to its charges being unreasonable and excessive based on its admitted-to costs and the testimony of Paley, Complete Imaging's charges are also grossly excessive when compared to other prominent Michigan payors.

742.    For example, Medicare reimbursed for MRIs performed in Macomb, Oakland, and Wayne counties at the following amounts for MRIs performed in 2015 through 2017:

|  | 2015A | 2015B | 2016 | 2017 |
|---|---|---|---|---|
| **CPT Code 70551** | $230.15 | $231.30 | $232.01 | $234.22 |
| **CPT Code 72141** | $244.06 | $224.52 | $225.73 | $228.00 |
| **CPT Code 72146** | $223.40 | $224.52 | $225.73 | $228.35 |
| **CPT Code 72148** | $223.33 | $223.44 | $224.66 | $227.29 |
| **CPT Code 73221** | $235.81 | $236.99 | $237.80 | $240.78 |
| **CPT Code 73718** | $364.47 | $366.29 | $366.28 | $368.59 |
| **CPT Code 73721** | $325.45 | $236.63 | $238.16 | $240.42 |

743.    Michigan Medicaid reimbursed for MRIs performed from 2015 through 2017 at the following amounts:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| **CPT Code 70551** | $127.77 | $128.37 | $129.16 |
| **CPT Code 72141** | $124.01 | $124.80 | $125.60 |
| **CPT Code 72146** | $124.01 | $124.80 | $125.79 |
| **CPT Code 72148** | $123.22 | $124.21 | $125.20 |
| **CPT Code 73221** | $130.75 | $131.54 | $132.73 |
| **CPT Code 73718** | $202.46 | $203.05 | $203.84 |
| **CPT Code 73721** | $130.75 | $131.74 | $132.53 |

744.    The Michigan workers' compensation program reimbursed MRIs performed from 2015 through 2017 at the following amounts:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| **CPT Code 70551** | $230.15 | $232.01 | $234.22 |
| **CPT Code 72141** | $324.04 | $225.73 | $228.00 |
| **CPT Code 72146** | $223.40 | $225.73 | $228.35 |
| **CPT Code 72148** | $222.33 | $224.66 | $227.29 |
| **CPT Code 73221** | $235.81 | $237.80 | $240.78 |
| **CPT Code 73718** | $364.47 | $366.28 | $368.59 |
| **CPT Code 73721** | $235.45 | $238.16 | $240.42 |

745.    Allstate is not suggesting that it should pay only what other Michigan payors pay for MRIs.

746.    However, the reimbursement amounts from other payors are indicative of the range for what a reasonable charge and reimbursement is per MRI.

747.   Complete Imaging's charges are well outside this range and the spectrum of reasonableness and the defendants cannot sustain their burden of proving otherwise.

## XI.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

748.   To induce Allstate to pay promptly their fraudulent charges for unlawful and unnecessary medical services, the defendants submitted and caused to be submitted to Allstate false medical documentation that materially misrepresented that the services they provided were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

749.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

750.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157.

751.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily

warranted that such bills and records related to lawfully rendered and medically necessary treatment for their patients' care, recovery, or rehabilitation.

752.   There are no less than eleven (11) separate reasons why the defendants' purported treatment was in fact not necessary or lawful (and, therefore, was fraudulently billed to Allstate):

a.  Total Health and North West Labs billed Allstate for treatment and services that were not actually provided.

b.  The defendants illegally paid kickbacks in exchange for patient referrals, resulting in the performance of medically unnecessary treatment that would not have been performed but for the financial incentive provided by the defendants.

c.  The defendants directly benefited from illegal solicitation of patients for unnecessary imaging, urine drug testing, and physical therapy, including through the use of runners.  The defendants were aware that the solicitation methods used by referring providers did not include considerations of medical necessity and targeted patients who would not have otherwise sought any medical care on their own but for the unlawful solicitation.

d.  Complete Imaging submitted bills to Allstate seeking payment for medically unnecessary MRIs that were ordered as a matter of course at the outset of treatment, were excessive in number, and were not ordered by the referring physician.

e.  Complete Imaging submitted bills to Allstate for MRIs that were medically unnecessary and failed to adhere to applicable standards of care, including ACR guidelines.  Complete Imaging routinely performed MRIs that lacked any supporting examination or neurologic test findings.  It was Complete Imaging's responsibility to confirm the need for MRIs pursuant to ACR guidelines before performing the same.

f.  Complete Imaging submitted bills to Allstate seeking payment for MRI charges that, by its own admissions in documents submitted to the State of Michigan, were many times its cost for each MRI purportedly performed.

Complete Imaging's charges to Allstate were not reasonable and therefore non-compensable under the Michigan No-Fault Act.

g. Total Health used an unlawful predetermined treatment protocol, supported by use of boilerplate purported examination findings, to perform excessive physical therapy which had no relationship to medical necessity or any patient-specific considerations.

h. Total Health unlawfully provided physical therapy treatment (if at all) in the absence of a valid physician prescription in violation of Michigan law at the time.

i. Orchard Toxicology and North West Labs billed for unnecessary and excessive urine drug testing. Numerous patients at issue in this Complaint received definitive urine drug testing with no justification or basis for such testing. Such testing was performed for an unreasonable and excessive number of substances as a result of Orchard Toxicology's and North West Labs's improper use of predetermined test panels.

j. Orchard Toxicology and North West Labs submitted charges to Allstate using multiple CPT Codes to describe the same procedure allegedly performed, which is a fraudulent billing practice known as unbundling.

k. Orchard Toxicology did not customarily in violation of the No-Fault Act, as Orchard Toxicology admitted to Allstate that it charged cash patients and other insurers less than it charged Allstate for the same urine drug testing services.

753. As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and rendered treatment without basis or adequate substantiation.

754. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

755. The foregoing acts – billing for services not rendered; payment of kickbacks; solicitation of medically unnecessary referrals; patterns of unnecessary and excessive MRIs, urine drug tests, and physical therapy treatment; Orchard Toxicology unlawfully charging cash patients and other insurers less than it charged Allstate for the same urine drug testing services; and the defendants' inflated and unreasonable charges for MRIs – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this Complaint.

756. Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment allegedly provided by the defendants unlawful and unnecessary.

757. The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 4.

758. Thus, each claim for payment (and accompanying medical record) under Michigan's No-Fault Act mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was unlawful, not medically necessary, and unreasonably charged, all of which render claims non-compensable under Michigan law.

759.    Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the MRIs, urine drug tests, and physical therapy treatments for which they billed Allstate.

760.    As the defendants did not render reasonably necessary medical treatment, misrepresented the circumstances and lawfulness surrounding the procedures and tests purportedly performed, and charged unreasonable and uncustomary amounts, each bill and accompanying documentation mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.    ALLSTATE'S JUSTIFIABLE RELIANCE

761.    At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and (lack of) medical necessity of the treatment and testing allegedly provided to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

762.    These misrepresentations include submitting medical documentation, including HICFs, falsely documenting the fact, lawfulness, and necessity of medical treatment in order to seek reimbursement under Michigan's No-Fault Act.

763.   Evidence of the fraudulent scheme detailed herein was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

764.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme from Allstate, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

765.   In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

766.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

767.   As a result, Allstate has paid in excess of $656,705 to Complete Imaging, Orchard Toxicology, North West Labs, and Total Health in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XII.   MAIL FRAUD RACKETEERING ACTIVITY

768.   As discussed above, the services purportedly provided by the defendants were not medically necessary, were unlawful, and/or were fraudulently billed.

769. The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1, 2, 3, and 4, was to collect No-Fault benefits to which the defendants were not entitled because the services rendered, if at all, were not necessary and not lawfully rendered, and were billed to Allstate at unreasonable and uncustomary amounts.

770. This objective necessarily required the submission of claims for reimbursement to Allstate.

771. The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

772. All documents, medical records, notes, reports, HICFs, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

773. Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to the financial institution(s) from which the drafts were drawn, as well as the return of settlement draft duplicates to the insurance company.

774.    Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

775.    The fraudulent medical billing scheme detailed herein generated hundreds of mailings.

776.    A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 26.

777.    As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be mailed to Allstate related to each exemplar patient discussed in this Complaint.

778.    It was in the ordinary course of business for Complete Imaging, Orchard Toxicology, North West Labs, and Total Health to submit claims for No-Fault reimbursement to insurance carriers like Allstate through the U.S. Mail.

779.    Moreover, the business of providing medical services by each of the Defendant Facilities at issue herein is regularly conducted by fraudulently seeking reimbursement to which each Defendant Facility is not entitled through the use of fraudulent communications sent via the U.S. Mail.

780.    In other words, discrete (claim- and patient-specific) instances of mail are a regular way of doing business for each of the Defendant Facilities.

781. The Defendant Facilities, at the direction and with the knowledge of Ahmad and Elias, continue to submit claims for payment to Allstate and, in some instances, continue to attempt to collect on unpaid claims.

782. Thus, the defendants' commission of mail fraud continues.

783. As all the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that were not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

784. Allstate reasonably relied on the submissions it received from Complete Imaging, Orchard Toxicology, North West Labs, and Total Health through the U.S. Mail in tendering payment to the defendants, including the representative submissions set out in Exhibit 26 annexed hereto and identified in the exemplar claims above.

785. As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII. <u>DAMAGES</u>

786. The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of law.

787.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $656,705.

788.   Exhibits 27 through 29, annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor,  patient claim number, check number, and amount.

789.   Exhibit 27 details payments made by Allstate to Complete Imaging since November 16, 2013.

790.   Exhibit 28 details payments made by Allstate to Orchard Toxicology since April 15, 2015.

791.   Exhibit 29 details payments made by Allstate to Total Health since January 25, 2013.

792.   Every claim identified in Exhibits 27 through 29 derives from an Allstate insurance policy.

793.   Allstate's claim for compensatory damages, as set out in Exhibits 27 through 29, does not include payment made with respect to any Assigned Claim Facility claimant.

794.   Every payment identified in Exhibits 27 through 29 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 27 through 29.

795.   Moreover, every payment identified in Exhibits 27 through 29 derives from a check sent by Allstate to the defendants through the U.S. Mail.

796.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

797.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of investigation to uncover the fraudulent activities of the defendants and the cost of claims handling/adjustment for claims submitted by the defendants.

798.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  **CAUSES OF ACTION**

### **COUNT I**
### **VIOLATION OF 18 U.S.C. § 1962(c)**
### **(Complete Imaging Enterprise)**
### **Against Sami Ahmad and Omar Elias a/k/a Omar Asker**

799.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

800.    Complete Imaging constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

801.   In connection with each of the claims identified in the within Complaint, Sami Ahmad and Omar Elias a/k/a Omar Asker ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by Complete Imaging or knew that such false medical documentation would be mailed in the ordinary course of Complete Imaging's business, or should have reasonably foreseen that the mailing of such false medical documentation by Complete Imaging would occur, in furtherance of the Count I defendants' scheme to defraud.

802.   The Count I defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 26.

803.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

804.   Policies of insurance were delivered to insureds through the U.S. Mail.

805.   Payments to Complete Imaging from Allstate were transmitted through the U.S. Mail.

806.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed at and/or by Complete Imaging, which they knew would be billed by Complete Imaging to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

807.   Ahmad and Elias owned and controlled Complete Imaging.

808.   As a result of, and in reasonable reliance on, the misleading documents and representations mailed by the Count I defendants, Allstate, by its agents and employees, issued drafts to Complete Imaging for the benefit of the Count I defendants that would not otherwise have been paid.

809.   The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be

submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

810.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

811.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

812.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Complete Imaging for the benefit of the Count I defendants.

813.   The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

814.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

815.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

816.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

817.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

818.    By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Complete Imaging Enterprise)**
**Against Sami Ahmad and Omar Elias a/k/a Omar Asker**

819.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

820.    Defendants Sami Ahmad and Omar Elias a/k/a Omar Asker ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Complete Imaging.

821.    The Count II defendants each agreed to further, facilitate support, and operate Complete Imaging.

822.    As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

823.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Complete Imaging even though Complete Imaging was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

824.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

825.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

826.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Orchard Toxicology Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

827.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

828.   Orchard Toxicology constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

829.   In connection with each of the claims identified in the within Complaint, Sami Ahmad and Omar Elias a/k/a Omar Asker ("Count III defendants") intentionally caused to be prepared and mailed false medical documentation by Orchard Toxicology or knew that such false medical documentation would be mailed in the ordinary course of Orchard Toxicology's business, or should have reasonably foreseen that the mailing of such false medical documentation by Orchard Toxicology would occur, in furtherance of the Count III defendants' scheme to defraud.

830.   The Count III defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 26.

831.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

832.   Policies of insurance were delivered to insureds through the U.S. Mail.

833.   Payments to Orchard Toxicology from Allstate were transmitted through the U.S. Mail.

834.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed at and/or by Orchard Toxicology, which they knew would be billed by Orchard Toxicology to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

835.   Ahmad and Elias owned and controlled Orchard Toxicology.

836.   As a result of, and in reasonable reliance on, the misleading documents and representations mailed by the Count III defendants, Allstate, by its agents and employees, issued drafts to Orchard Toxicology for the benefit of the Count III defendants that would not otherwise have been paid.

837.   The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

838.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

839.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

840.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Orchard Toxicology for the benefit of the Count III defendants.

841.   The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

842.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

843.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

844.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

845.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

846.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to submitted, by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
## (Orchard Toxicology Enterprise)
## Against Sami Ahmad and Omar Elias a/k/a Omar Asker

847.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

848.   Defendants Sami Ahmad and Omar Elias a/k/a Omar Asker ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Orchard Toxicology.

849.   The Count IV defendants each agreed to further, facilitate support, and operate Orchard Toxicology.

850.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

851.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Orchard Toxicology even though Orchard Toxicology was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

852.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

142

853.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

854.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (North West Labs Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

855.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

856.    North West Labs constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

857.    In connection with each of the claims identified in the within Complaint, Sami Ahmad and Omar Elias a/k/a Omar Asker ("Count V defendants") intentionally caused to be prepared and mailed false medical documentation by North West Labs or knew that such false medical documentation would be mailed in the ordinary course of North West Labs's business, or should have reasonably

foreseen that the mailing of such false medical documentation by North West Labs would occur, in furtherance of the Count V defendants' scheme to defraud.

858.   The Count V defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 26.

859.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

860.   Policies of insurance were delivered to insureds through the U.S. Mail.

861.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed at and/or by North West Labs, which they knew would be billed by North West Labs in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

862.   Ahmad and Elias owned and controlled North West Labs.

863.   As a result of, and in reasonable reliance on, the misleading documents and representations mailed by the Count V defendants, Allstate, by its agents and

employees, issued drafts to North West Labs for the benefit of the Count V defendants that would not otherwise have been paid.

864. The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

865. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

866. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

867. The activities alleged in this Complaint had the direct effect of causing Allstate to incur expenses to investigate and adjust bills submitted by North West Labs for the benefit of the Count V defendants.

868. The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

869. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

870.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

871.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

872.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

873.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (North West Labs Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

874.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

875.   Defendants Sami Ahmad and Omar Elias a/k/a Omar Asker ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of North West Labs.

876.   The Count VI defendants each agreed to further, facilitate support, and operate North West Labs.

877.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

878.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of North West Labs even though North West Labs was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

879.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

880.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has incurred expenses related to the investigation and adjustment of North West Labs's improper bills submitted as a result of the Count VI defendants' unlawful conduct described herein.

881.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Total Health Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

882.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

883.    Total Health constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

884.    In connection with each of the claims identified in the within Complaint, Sami Ahmad and Omar Elias a/k/a Omar Asker ("Count VII defendants") intentionally caused to be prepared and mailed false medical documentation by Total Health or knew that such false medical documentation would be mailed in the ordinary course of Total Health's business, or should have reasonably foreseen that the mailing of such false medical documentation by Total Health would occur, in furtherance of the Count VII defendants' scheme to defraud.

885.    The Count VII defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 26.

886.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

148

887.   Policies of insurance were delivered to insureds through the U.S. Mail.

888.   Payments to Total Health from Allstate were transmitted through the U.S. Mail.

889.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed at and/or by Total Health, which they knew would be billed by Total Health to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

890.   Ahmad and Elias owned and controlled Total Health.

891.   As a result of, and in reasonable reliance on, the misleading documents and representations mailed by the Count VII defendants, Allstate, by its agents and employees, issued drafts to Total Health for the benefit of the Count VII defendants that would not otherwise have been paid.

892.   The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

893.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

894.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

895.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Total Health for the benefit of the Count VII defendants.

896.   The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

897.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

898.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

899.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

900.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

901.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Total Health Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

902.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

903.   Defendants Sami Ahmad and Omar Elias a/k/a Omar Asker ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Total Health.

904.   The Count VIII defendants each agreed to further, facilitate support, and operate Total Health.

905.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

906.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Total Health even though Total Health was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

907.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

908.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

909.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IX
### COMMON LAW FRAUD
### Against All Defendants

910.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

911.   The scheme to defraud Allstate perpetrated by Sami Ahmad, Omar Elias a/k/a Omar Asker, Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard Laboratories Corp. d/b/a Orchard Toxicology, North West Labs, Inc., and

152

Total Health Rehab, LLC ("Count IX defendants") was dependent upon a succession of material misrepresentations of fact that the Defendant Facilities were lawfully and actually rendering necessary medical treatment in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

912.   The misrepresentations of fact made by the Count IX defendants include, but are not limited to, those material misrepresentations discussed in section XI, *supra*.

913.   The Count IX defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

914.   The misrepresentations were intentionally made by the Count IX defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, and knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

915.   The Count IX defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not compensable under Michigan law.

916.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

917.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT X
## CIVIL CONSPIRACY
### Against All Defendants

918.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

919.   Defendants Sami Ahmad, Omar Elias a/k/a Omar Asker, Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard Laboratories Corp. d/b/a Orchard Toxicology, North West Labs, Inc., and Total Health Rehab, LLC ("Count X defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were not entitled because (1) the defendants billed for services not rendered, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants did not submit reasonable and customary charges to Allstate.

920.   The Count X defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

921.   This purpose was known to all of the Count X defendants and intentionally pursued.

922.   Despite knowing that the defendants were not entitled to reimbursement under the No-Fault Act because they billed for services that were not reasonably necessary, because they billed for services not rendered, because treatment was not lawfully rendered, and because they charged outrageous and unreasonable prices, the Count X defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

923.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

924.   All of the Count X defendants benefitted from the payments wrongfully procured from Allstate.

925.   All of the Count X defendants directly benefited from the payments made to Complete Imaging, Orchard Toxicology, and Total Health.

926.   Therefore the Count X defendants committed acts that caused damage to Allstate.

927.   All of the Count X defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count X defendants in the commission of acts done for the benefit of all Count X defendants and to the unjustified detriment of Allstate.

928.    Accordingly, all of the Count X defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

**COUNT XI**
**PAYMENT UNDER MISTAKE OF FACT**
**Against Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard**
**Laboratories Corp. d/b/a Orchard Toxicology, and Total Health Rehab, LLC**

929.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

930.    Allstate paid the amounts described herein and itemized in Exhibits 27 through 29 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of medical services purportedly provided by Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard Laboratories Corp. d/b/a Orchard Toxicology, and Total Health Rehab, LLC (the "Count XI defendants").

931.    Allstate sustained damages by paying under a mistake of fact the claims submitted by and on behalf of the Count XI defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical treatment allegedly rendered.

932.    The Count XI defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

933.   Allstate is entitled to restitution from each of the Count XI defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

**COUNT XII**
**UNJUST ENRICHMENT**
**Against Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard**
**Laboratories Corp. d/b/a Orchard Toxicology, and Total Health Rehab, LLC**

934.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

935.   Allstate paid monies, including those amounts set out in Exhibits 27 through 29, in response to the claims submitted, or caused to be submitted, by defendants Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard Laboratories Corp. d/b/a Orchard Toxicology, and Total Health Rehab, LLC (the "Count X defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

936.   Allstate's payments constitute a benefit which the Count XII defendants aggressively sought and voluntarily accepted.

937.   The Count XII defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

938.   The Count XII defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

939.   The Count XII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

940.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 798 set forth above as if fully set forth herein.

941.    Defendants Sami Ahmad, Omar Elias a/k/a Omar Asker, Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard Laboratories Corp. d/b/a Orchard Toxicology, North West Labs, Inc., and Total Health Rehab, LLC ("Count XIII defendants") routinely billed for unlawful and unnecessary medical treatment and testing with respect to the patients at issue in this Complaint.

942.    The Count XIII defendants also rendered medical treatment pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment and testing.

943.    Complete Imaging submitted and continues to submit unreasonable charges for MRIs to Allstate.

944.    The Count XIII defendants paid kickbacks in exchange for referrals, resulting in the performance of medically unnecessary services.

945.    The Count XIII defendants illegally solicited patients, resulting in the performance of medically unnecessary services.

946.   The Count XIII defendants rendered excessive testing and treatment in violation of applicable standards of care for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical services.

947.   Pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, an insurer is liable to pay benefits only for reasonable, necessary, and lawful expenses arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105, 500.3107, and 500.3157.

948.   The lack of reasonableness, necessity, and lawfulness are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3107 and 500.3157.

949.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

950.   Further, providers may only charge reasonable and customary amounts for the products, services, and accommodations rendered.  Mich. Comp. Laws § 500.3157.

951.   The Count XIII defendants continue to submit claims under the No-Fault Act for unnecessary and/or unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

952.    The Count XIII defendants will continue to bill Allstate for No- Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and/or previously-denied No-Fault claims submitted by any of the Count XIII defendants for any or all of the reasons set out in the within Complaint.

953.    Complete Imaging, Orchard Toxicology, North West Labs, and Total Health will continue to bill Allstate unreasonable amounts for unlawful and medically unnecessary testing and treatment absent a declaration by this Court that such testing and treatment is unlawful and unnecessary, that the charges related thereto are unreasonable, and that Allstate has no obligation to pay pending and/or previously-denied No-Fault claims submitted by Complete Imaging, Orchard Toxicology, North West Labs, and Total Health to the extent the same constitute unlawful, unnecessary, and unreasonable charges.

954.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants provided medically unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

955.    Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants were engaged in a fraudulent scheme whereby they provided medically unnecessary treatment and

submitted unreasonable and uncustomary charges for the same to Allstate at all relevant times.

956.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the charges for MRIs submitted by Complete Imaging are and were unreasonable at all relevant times.

957.   As such, the Count XIII defendants have no standing to submit, pursue, or receive assigned No-Fault benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that Complete Imaging, Orchard Toxicology, North West Labs, and Total Health cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

958.   Allstate further requests a judgment pursuant to the Declaratory Judgement Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XV.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Complete Imaging Enterprise)**
**Against Sami Ahmad and Omar Elias a/k/a Omar Asker**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Complete Imaging Enterprise)**
**Against Sami Ahmad and Omar Elias a/k/a Omar Asker**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Orchard Toxicology Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Orchard Toxicology Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (North West Labs Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (North West Labs Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

164

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Total Health Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Total Health Enterprise)
### Against Sami Ahmad and Omar Elias a/k/a Omar Asker

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IX
## COMMON LAW FRAUD
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT X
## CIVIL CONSPIRACY
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XI
### PAYMENT UNDER MISTAKE OF FACT
**Against Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard Laboratories Corp. d/b/a Orchard Toxicology, and Total Health Rehab, LLC**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XII
### UNJUST ENRICHMENT
**Against Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard Laboratories Corp. d/b/a Orchard Toxicology, and Total Health Rehab, LLC**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XIII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)    DECLARE that Allstate has no obligation to pay pending and/or previously denied No-Fault insurance claims submitted by Sami Ahmad, Omar Elias a/k/a Omar Asker, Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard Laboratories Corp. d/b/a Orchard Toxicology, North West Labs, Inc., and Total Health Rehab, LLC for any or all of the reasons set out in the within Complaint;

(b)    DECLARE that the charges for MRIs submitted by Integrated MRI Center, LLC d/b/a Complete Imaging are unreasonable and it therefore cannot seek

payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)   DECLARE that Integrated MRI Center, LLC d/b/a Complete Imaging, Orchard Laboratories Corp. d/b/a Orchard Toxicology, North West Labs, Inc., and Total Health Rehab, LLC cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint;

(d)   GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVI.  **JURY TRIAL DEMAND**

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

168

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*
_____
Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
Livonia, MI 48152
(734) 521-9000
350 Granite Street, Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Fire and Casualty Insurance*
*Company, and Allstate Property and*
*Casualty Insurance Company*

Dated: February 6, 2018